**Jalil Abdul MUNTAQIM, also known as Anthony Bottom, Plaintiff–Appellant,**

v.

**Phillip COOMBE, Anthony Annucci, and Louis F. Mann, Defendants–Appellees.**

**Docket No. 01–7260.**

United States Court of Appeals, Second Circuit.

Argued: March 10, 2003.

Decided: April 23, 2004.

Jonathan W. Rauchway (J. Peter Coll, Jr., Cleo A. Jones, and Tara J. Myslinski, Orrick, Herrington & Sutcliffe LLP, of counsel), New York, NY, for Plaintiff–Appellant.

Julie M. Sheridan, Assistant Solicitor General (Caitlin J. Halligan, Solicitor General, and Peter H. Schiff, Senior Counsel, of counsel, Eliot Spitzer, Attorney General of the State of New York, on the brief), Albany, NY, for Defendants–Appellees.

Nancy Northup (Jessie Allen, Kim Barry, of counsel), Brennan Center for Justice, New York University School of Law, New York, NY, for amicus curiae Brennan Center for Justice.

Before: MESKILL, CARDAMONE and CABRANES, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge.

We are asked in this case to decide whether the Voting Rights Act ("VRA"), which prohibits voting qualifications that result in the abridgment of the right to

vote on account of race, can be applied to a New York State statute that disenfranchises currently incarcerated felons and parolees. Although we recognize that this is a difficult question that can ultimately be resolved only by a determination of the United States Supreme Court, we conclude that the Voting Rights Act, which is silent on the topic of state felon disenfranchisement statutes, cannot be applied to draw into question the validity of New York's disenfranchisement statute. We believe that, in light of recent Supreme Court decisions that have clarified the scope of Congress's enforcement power under the Reconstruction Amendments,[1] the application of the Voting Rights Act to felon disenfranchisement statutes such as that of New York would infringe upon the states' well-established discretion to deprive felons of the right to vote. Because the Supreme Court has instructed us that statutes should not be construed to alter the constitutional balance between the states and the federal government unless Congress makes its intent to do so unmistakably clear, we will not construe the Voting Rights Act to extend to New York's felon disenfranchisement statute.

Plaintiff–Appellant Jalil Abdul Muntaqim, a convicted felon imprisoned in New York, appeals from a judgment of the United States District Court for the Northern District of New York (Norman A. Mordue, *Judge*), granting defendants' motion for summary judgment and dismissing the complaint in its entirety. In the complaint, Muntaqim alleged, *inter alia,* that New York State's felon disenfranchisement statute, N.Y. Elec. Law § 5–106 (" § 5–106"), violates section 2 of the Voting Rights Act of 1965, Pub.L. No. 89–110, 79 Stat. 437 (*codified as amended at* 42 U.S.C. § 1973) (" § 1973"). Section 5–106 disenfranchises all felons in the State of New York who are incarcerated or on parole. Muntaqim asserts that this statute violates § 1973 because it "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 42 U.S.C. § 1973(a).

The District Court concluded that Muntaqim had failed to state a § 1973 claim because that provision of the Voting Rights Act is not applicable to New York's felon disenfranchisement statute. We agree. Under Supreme Court precedent, because § 1973 would alter the constitutional balance between the states and the federal government if it were construed to extend to state felon disenfranchisement statutes such as § 5–106, we look for a clear statement from Congress to support that construction of the statute. Having found no such statement, we hold that § 1973 cannot be used to challenge the legality of § 5–106. In so holding, we do not in any way cast doubt on Congress's authority to enact the Voting Rights Act, nor do we purport to decide whether, as a general rule, the "results" methodology of § 1973 is constitutionally valid. Instead, we hold only that, in the absence of a clear statement from Congress, § 1973 should not be applied to state felon disenfranchisement statutes, such as those of New York, which are expressly sanctioned in the text of the Constitution and have been widely used as a penological tool since before the Civil War.

## BACKGROUND

Muntaqim is a black inmate at the Shawangunk Correctional Facility in Wallkill, New York who is currently serving a maxi-

---

**1.** For ease of reference, we refer to the Fourteenth and Fifteenth Amendments of the Constitution as the Reconstruction Amendments.

mum sentence of life imprisonment. On September 26, 1994, he filed a *pro se* complaint against several officials of the New York State Department of Correctional Services (collectively, "defendants") alleging, *inter alia*, that § 5–106, New York State's felon disenfranchisement statute, violates § 1973 because it "results in a denial or abridgement of the right ... to vote on account of race." 42 U.S.C. § 1973(a).[2]

In particular, the complaint asserts that, even if the New York State legislature did not intend to discriminate when it enacted § 5–106, that statute violates the Voting Rights Act because it has " 'resulted' in unlawful dilution of voting rolls in the African–American and Hispanic communities

of New York City" (Compl.¶ 18), and because the racial disparity in New York's prison population is caused, at least in part, by racial discrimination in sentencing.[3] Muntaqim alleges that, although blacks and Hispanics constitute less than thirty percent of the voting-age population in New York State, they make up over eighty percent of the inmates in the state prison system. Moreover, according to the complaint, eighty percent of incarcerated Hispanics and blacks come from "New York City and it[ ]s environs."[4] (*Id.*) Based on these figures, Muntaqim claims that § 5–106 violates § 1973 both by denying him the right to vote and by "diluting" the so-called black and Hispanic vote in New York City.[5]

2. The complaint also challenged the constitutionality of § 5–106, as well as § 79–a of the New York State Civil Rights Law, which deems persons sentenced to life imprisonment to be "civilly dead"; § 803 of the New York State Correction Law, which prohibits inmates serving life sentences from accumulating "good time credits"; and § 805 of the New York State Correction Law, which, at the time of this appeal, prevented inmates who are serving a minimum sentence of more than six years from participating in the "earned eligibility program." The District Court granted summary judgment to the defendants dismissing each of these claims, and Muntaqim does not challenge their dismissal on appeal.

3. Although Muntaqim does not unambiguously allege racial discrimination in sentencing, we read his *pro se* pleadings "liberally and interpret them to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999). From that standpoint, we agree with Muntaqim's appellate counsel that Muntaqim's complaint, which states that "[t]he defendants are ... engaging in conduct that discriminates and establishes a class system of disenfranchisement" (Compl.¶ 8), and that African–Americans and Hispanics who have been sentenced in New York have been "irreperabl[y] harm[ed]" (Compl.¶ 18), should be construed to mean that the "gross racial disparity in

New York's prison population is caused, at least in part, by race-based disparities in sentencing," Pl.'s Br. at 5.

4. The New York State Constitution provides that, "[f]or the purpose of voting, no person shall be deemed to have gained or lost a residence ... while confined in any public prison." N.Y. Const. art. II, § 4. Accordingly, enfranchised prisoners vote in the district where they resided prior to incarceration. For this reason, the greater the number of incarcerated felons who come from New York City, the greater the impact of § 5–106 on the vote in New York City.

5. A plaintiff may raise two separate types of § 1973 claims: "vote denial" and "vote dilution". Vote denial occurs, as the term denotes, when the ability to vote is denied on account of race, while vote dilution occurs when a voting practice diminishes "the force of minority votes that were duly cast and counted." *Holder v. Hall,* 512 U.S. 874, 896, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994) (Scalia and Thomas, JJ., concurring in judgment). Muntaqim's vote denial claim is based on the fact that § 5–106 prohibits him from voting. (*See* Compl. ¶¶ 12–16) His vote dilution claim appears to be based on his claim that § 5–106 disproportionately diminishes the strength of votes cast by Hispanic and black voters who reside in and around New York City. (*See* Compl. ¶ 18)

On October 25, 1999, the defendants moved for summary judgment, and the motion was referred to Magistrate Judge Gustave J. DiBianco. The magistrate judge filed a Report and Recommendation on July 18, 2000, recommending that the defendants' motion be granted because § 1973 is not applicable to felon disenfranchisement statutes. After receipt of Muntaqim's timely objection, the District Court adopted in full the Report and Recommendation on January 24, 2001, and entered judgment in favor of the defendants. Muntaqim then filed a timely notice of appeal, and, on June 4, 2002, we appointed counsel for Muntaqim.

Because the District Court ruled that Muntaqim's complaint failed to state a cognizable claim under the Voting Rights Act, we will treat its decision as a ruling on a motion to dismiss rather than a ruling on a motion for summary judgment. *See Schwartz v. Compagnie General Transatlantique*, 405 F.2d 270, 273 (2d Cir.1968) ("A motion for summary judgment may be made solely on the pleadings[;] when it is so made it is functionally the same as a motion to dismiss or a motion for judgment on the pleadings.").

## DISCUSSION

### I. *Standard of Review*

■ We review District Court determinations on motions to dismiss and motions for summary judgment *de novo*. *See, e.g., Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir.2003). In this case, "because the district court's disposition 'presents only a legal issue of statutory interpretation .... [w]e review *de novo* whether the district court correctly interpreted the statute.' " *Perry v. Dowling*, 95 F.3d 231, 235 (2d Cir.1996) (quoting *White v. Shalala*, 7 F.3d 296, 299 (2d Cir. 1993)).

### II. *Relevant Statutory Provisions*

Section 5–106 of the New York Election Law provides that no person convicted of a felony "shall have the right to register for or vote at any election" unless he has been pardoned, his maximum sentence of imprisonment has expired, or he has been discharged from parole.[6] Accordingly, no

---

**6.** New York Election Law § 5–106(2)–(5) states, in relevant part:

2. No person who has been convicted of a felony pursuant to the laws of this state, shall have the right to register for or vote at any election unless he shall have been pardoned or restored to the rights of citizenship by the governor, or his maximum sentence of imprisonment has expired, or he has been discharged from parole. The governor, however, may attach as a condition to any such pardon a provision that any such person shall not have the right of suffrage until it shall have been separately restored to him.

3. No person who has been convicted in a federal court, of a felony, or a crime or offense which would constitute a felony under the laws of this state, shall have the right to register for or vote at any election unless he shall have been pardoned or restored to the rights of citizenship by the

president of the United States, or his maximum sentence of imprisonment has expired, or he has been discharged from parole.

4. No person who has been convicted in another state for a crime or offense which would constitute a felony under the laws of this state shall have the right to register for or vote at any election in this state unless he shall have been pardoned or restored to the rights of citizenship by the governor or other appropriate authority of such other state, or his maximum sentence has expired, or he has been discharged from parole.

5. The provisions of subdivisions two, three and four of this section shall not apply if the person so convicted is not sentenced to either death or imprisonment, or if the execution of a sentence of imprisonment is suspended.

residents of New York State who are presently incarcerated for a felony or are on parole may vote in local, state, or federal elections.[7]

Section 2 of the Voting Rights Act, codified at 42 U.S.C. § 1973 and originally enacted in 1965, prohibits any state limitation on the right to vote that has a racially discriminatory result. In particular, the current version of § 1973(a) provides:

No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color
. . . .

42 U.S.C. § 1973(a).[8] Section 1973(b) states that "[a] violation of subsection (a) . . . is established if, based on the totality of the circumstances, it is shown that . . . members [of protected racial minorities] have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b).

The current language of § 1973 was enacted by Congress as part of the Voting Rights Act Amendments of 1982, Pub.L. No. 97–205, § 3, 96 Stat. 131, 134, largely in response to the Supreme Court's decision in *City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). *See Thornburg v. Gingles*, 478 U.S. 30, 35, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). In *Bolden*, a plurality of the Court held that racially neutral state action violates § 1973 only if it is motivated by a discriminatory purpose. 446 U.S. at 62, 100 S.Ct. 1490. The amended version of § 1973 eliminates this "discriminatory purpose" requirement and, instead, prohibits any voting qualification or standard that "results" in the denial of the right to vote "on account of" race.

## III. Applicability of § 1973 to Felon Disenfranchisement Statutes

### A. Baker v. Pataki

In *Baker v. Pataki*, 85 F.3d 919 (2d Cir.1996), our *in banc* Court addressed the exact legal question presented by this case—namely, whether § 1973 is applicable to felon disenfranchisement statutes generally and to § 5–106 in particular.[9] Because the ten members of the Court who decided *Baker* split evenly on its disposition, the opinions in that case have no

---

**7.** Although § 5–106 disenfranchises felons on parole as well as incarcerated felons, for ease of reference we refer to the class of felons disenfranchised by § 5–106 as "incarcerated felons." *Cf. Dixon v. Miller*, 293 F.3d 74, 78 (2d Cir.2002) (noting that a convict released on parole is still treated for habeas purposes as if he were "in custody").

**8.** Before its amendment in 1982, § 1973 provided: "No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color." *City of Mobile v. Bolden*, 446 U.S. 55, 60, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980).

**9.** In *Baker*, a group of black and Hispanic disenfranchised felons brought claims pursuant to 42 U.S.C. § 1983, alleging that § 5–106 disproportionately deprives blacks and Hispanics of their right to vote in violation of the Fourteenth and Fifteenth Amendments of the Constitution and § 1973. The District Court dismissed their complaint for failure to state a claim upon which relief could be granted. *See Baker v. Cuomo*, 842 F.Supp. 718 (S.D.N.Y.1993). A panel of this Court reversed, *see Baker v. Cuomo*, 58 F.3d 814 (2d Cir.1995), and then reaffirmed its decision in an opinion denying the defendants' petition for panel rehearing, *see Baker v. Cuomo*, 58 F.3d 814, 824–25 (2d Cir.1995). The *in banc* Court granted the defendants' petition for rehearing *in banc* only with respect to the § 1973 claims. *See Baker v. Cuomo*, 67 F.3d 39 (2d Cir.1995) (*in banc*).

precedential effect, and the decision of the District Court was left undisturbed. *See Baker,* 85 F.3d at 921 n. 2 (per curiam). Notwithstanding the significant guidance we have received from the Supreme Court on the issues presented since the opinions in *Baker* were announced, which we will consider below, the thorough and learned opinions in *Baker* help us to frame the issue once again presented for our consideration in this case.

### 1. Judge Mahoney's Opinion

In an opinion written by Judge Mahoney, and joined by Judges Miner, Walker, McLaughlin and Jacobs, five members of our Court concluded that § 1973 is not applicable to felon disenfranchisement statutes because such an application of § 1973 "would raise serious constitutional questions regarding the scope of Congress' authority to enforce the Fourteenth and Fifteenth Amendments and would alter the usual constitutional balance between the States and the Federal Government." *Baker,* 85 F.3d at 922 (Mahoney, J.) (internal quotation marks and citations omitted).

In his opinion, Judge Mahoney first noted that "the 'results' test of amended § 1973 reaches conduct which is not directly violative of the Fourteenth or Fifteenth Amendments[,]" because those Amendments apply directly only to intentional discrimination. *Id.* at 926.[10] Judge Mahoney went on to describe the history and widespread acceptance of felon disenfranchisement statutes in the United States. First, he explained that "felon disenfranchisement is a very widespread historical practice that has been accorded explicit constitutional recognition in § 2 of

the Fourteenth Amendment," *id.* at 928, which provides in relevant part that "when the right to vote at any [federal] election ... is denied to any of the male inhabitants of [a] state ... or in any way abridged, *except for participation in rebellion, or other crime,* the basis of representation therein shall be reduced...." U.S. Const. amend. XIV, § 2 (emphasis added). In support of the claim that felon disenfranchisement was sanctioned by the Fourteenth Amendment, Judge Mahoney relied, *Baker,* 85 F.3d at 929, on the Supreme Court's decision in *Richardson v. Ramirez,* 418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974), in which the Supreme Court rejected a nonracial Equal Protection challenge to the felon disenfranchisement provision of California's Constitution. In so doing, the Court reasoned that the Fourteenth Amendment "could not have been meant to bar outright a form of disenfranchisement which was expressly exempted from the less drastic sanction of reduced representation [in the House of Representatives] which § 2 [of the Fourteenth Amendment] imposed for other forms of disenfranchisement." *Id.* at 55, 94 S.Ct. 2655.

Judge Mahoney explained further that, in enacting the Voting Rights Act in 1965 and amending the Act in 1982, Congress made no finding that felon disenfranchisement served as "a pretext or proxy for racial discrimination." *Baker,* 85 F.3d at 929. Indeed, in 1965, both Judiciary Committees stated that section 4(c) of the Voting Rights Act, 42 U.S.C. § 1973b(c)— which bans any "test or device" that limits the ability to vote to those individuals with

---

**10.** Section 1 of the Fourteenth Amendment provides in relevant part that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Section 1 of the Fifteenth Amendment provides that "[t]he

right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV, § 1.

"good moral character"—does not prohibit felon disenfranchisement statutes. *Id.* (citing S.Rep. No. 89–162, at 24 (1965), *reprinted in* 1965 U.S.C.C.A.N. 2508, 2562) (joint views of Senators Thomas J. Dodd, Hart, Long, Kennedy, Bayh, Burdick, Tydings, Dirksen, Hruska, Fong, Scott, and Javits); H.R.Rep. No. 89–439, at 25–26 (1965) (*reprinted in* 1965 U.S.C.C.A.N. 2437, 2457). "Thus," according to Judge Mahoney, "not only has Congress failed ever to make a legislative finding that felon disenfranchisement is a pretext or proxy for racial discrimination; it has effectively determined that it has not." *Id.*

Having concluded that felon disenfranchisement statutes are sanctioned by the Fourteenth Amendment and that Congress found no history of racial discrimination through felon disenfranchisement, Judge Mahoney determined that "any attempt by Congress to subject felon disenfranchisement provisions to the 'results' methodology of § 1973 would pose a serious constitutional question concerning the scope of Congress' power to enforce the Fourteenth and Fifteenth Amendments." *Id.* at 930. In particular, "the application of § 1973 to state felon disenfranchisement statutes would ... undermine the constitutional balance between the federal and state governments" because "[t]he states have the primary responsibility for regulating the times, places, and manner of conducting federal elections, U.S. Const. art. 1, § 4, cl. 1, and even more obviously for regulating elections to state office." *Id.* at 931. Judge Mahoney noted also that "[t]o the extent that the disenfranchisement of felons is designed to punish persons who violate the laws of the states, the application of § 2 to felon disenfranchisement statutes would upset the sensitive relation between federal and state criminal jurisdiction." *Id.* (internal quotation marks omitted).

Upon concluding that the application of § 1973 to felon disenfranchisement statutes might fall outside the scope of Congress's authority to enforce the Reconstruction Amendments, Judge Mahoney drew our attention to several Supreme Court decisions declining to apply a statute that alters the balance of power between the states and the federal government unless Congress provided a "clear statement" that it intended the statute to have such an effect. *Id.* at 930 (citing, *inter alia*, *NLRB v. Catholic Bishop*, 440 U.S. 490, 500, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), and *Gregory v. Ashcroft*, 501 U.S. 452, 460–61, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991)). He then determined that "neither the statutory language nor the legislative history of § 1973 suggests Congress' *affirmative intention* to apply § 1973 to felon disenfranchisement statutes." *Id.* at 932 (emphasis added). Accordingly, Judge Mahoney concluded that the application of § 1973 to felon disenfranchisement statutes would violate the Supreme Court's "clear statement" rule. *Id.*

In sum, Judge Mahoney and the four other judges who joined his opinion concluded that, "[b]ecause it is not unmistakably clear that, in amending § 1973 in 1982 to incorporate the 'results' test, Congress intended that the test be applicable to felon disenfranchisement statutes, ... § 1973 does not apply to § 5–106[ ]." *Id.* at 922.

### 2. Opinions of Judge Feinberg and Judge Newman

Five other members of our Court reached the opposite conclusion. In an opinion authored by Judge Feinberg and joined by then-Chief Judge Newman and Judges Meskill, Kearse and Fred I. Parker, Judge Feinberg rejected Judge Mahoney's view that "since 'felon disenfranchisement is a very widespread historical

practice that has been accorded explicit constitutional recognition,' applying the Voting Rights Act to § 5–106 would raise 'serious constitutional questions.'" 85 F.3d at 937 (Feinberg, J.) (quoting opinion of Mahoney, J.). In rejecting that view, Judge Feinberg first questioned the significance attached by Judge Mahoney to § 2 of the Fourteenth Amendment, which appeared to Judge Mahoney implicitly to authorize felon disenfranchisement statutes. *Id.* at 936. Judge Feinberg drew our attention to *Hunter v. Underwood,* 471 U.S. 222, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985), in which the Supreme Court held that a provision of the Alabama Constitution that disenfranchised persons convicted of crimes involving moral turpitude violated the Fourteenth Amendment because its enactment was motivated by a desire to discriminate against blacks. In that case, Judge Feinberg noted, the Supreme Court expressed " 'confiden[ce] that § 2 [of the Fourteenth Amendment] was not designed to permit the purposeful racial discrimination attending the enactment and operation of [the relevant provision of the Alabama Constitution] which otherwise violates § 1 of the Fourteenth Amendment.'" *Id.* (quoting *Hunter,* 471 U.S. at 233, 105 S.Ct. 1916). Judge Feinberg relied also on the Supreme Court's decision in *Hunter* to assert that, contrary to Judge Mahoney's view, "felon disenfranchisement statutes often have been used to deny the right to vote on account of race." *Id.* at 938, 105 S.Ct. 1916 (citing *Hunter,* 471 U.S. at 232, 105 S.Ct. 1916 (concluding that the disenfranchisement statute adopted at the Alabama Constitutional Convention of 1901 purposely "selected such crimes as vagrancy, living in adultery, and wife beating that were thought to be more commonly committed by blacks" in order to evade the Fourteenth Amendment)).

Judge Feinberg acknowledged the requirement set forth by the Supreme Court in *Gregory* that Congress articulate a "plain statement" when it intends to alter the state-federal balance of power, but he concluded that "the Voting Rights Act does not alter the constitutional balance between the federal government and the States." *Id.* Instead, according to Judge Feinberg, § 1973 simply implements the balance that had already been achieved by the Fourteenth and Fifteenth Amendments, which "were specifically designed as an expansion of federal power and an intrusion on state sovereignty." *Id.* (quoting *Gregory,* 501 U.S. at 468, 111 S.Ct. 2395). In support of this conclusion, Judge Feinberg relied on the Supreme Court's decision in *Chisom v. Roemer,* 501 U.S. 380, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991), which applied § 1973's "results test" to the election of state judges. Judge Feinberg noted that, despite the fact that *Chisom* was decided the very same day as *Gregory,* the Supreme Court in *Chisom* did not apply the plain statement rule when it examined the applicability of § 1973 to the election of state judges; indeed, according to Justice Scalia, " 'the possibility of applying th[e] [plain statement] rule never crossed [the Court's] mind.'" *Id.* at 938–39 (quoting *Chisom,* 501 U.S. at 412, 111 S.Ct. 2354 (Scalia, J., dissenting)). Judge Feinberg concluded that, because the application of § 1973 to state judicial elections "is at least as much of an intrusion of federal authority into state affairs" as is its application to felon disenfranchisement statutes, the Supreme Court would not have applied the plain statement rule in *Baker.* *Id.* at 939.

Finally, Judge Feinberg reasoned that, even if § 1973's application to felon disen-. franchisement statutes would upset the balance of power between the states and the federal government, § 1973 applies to "any citizen," a category of persons that

includes incarcerated felons. According to Judge Feinberg, in light of § 1973's unambiguous and expansive reach, the provision is not required "to contain a plain statement of congressional intent to affect felon disenfranchisement." *Id.* at 940. Judge Feinberg and the four judges who joined his opinion thus "reject[ed] the argument that there is ambiguity in the Voting Rights Act that requires it to contain a plain statement of congressional intent to affect felon disenfranchisement," *id.*, and determined that § 1973 applies to felon disenfranchisement statutes.

Chief Judge Newman, in a separate opinion joined by Judge Fred I. Parker, concurred in Judge Feinberg's opinion, but also expressed some "additional thoughts." *Baker*, 85 F.3d at 941 (Newman, C.J.). Judge Newman noted that "[t]he substantive dispute between the opinions of Judge Mahoney and Judge Feinberg, upon analysis, turns out to be rather narrow." *Id.* While the two opinions agree on much, Judge Newman reasoned, "[w]here we ultimately divide is on the question whether the Voting Rights Act should be construed to apply the 'result' test of [§ 1973] to racial discrimination among felons." [11] *Id.* at 942. He explained:

> Judge Mahoney requires a clear statement of Congressional intent because the Supreme Court in other contexts has required such a statement. But, as Judge Feinberg points out, the Supreme Court has already decided [in *Chisom*] that [§ 1973] is not subject to the plain statement rule.

There is a fundamental reason why the plain statement rule does not apply in determining the coverage of [§ 1973]. The Fourteenth and Fifteenth Amendments have already altered the constitutional balance of federal and state powers, as the Supreme Court has explicitly recognized [in *Gregory* ]. Moreover, the pending case presents no ambiguity as to the construction of [§ 1973].

*Id.* (citations omitted). Judge Newman thus concluded that "Judge Mahoney's requirement of a plain statement" is "most inappropriate." *Id.* at 943.

**B.** *The District Court Opinion*

After reviewing the opinions in *Baker*, the District Court in the instant case followed Judge Mahoney's opinion and concluded that § 1973 "does not limit New York's authority to disenfranchise felons under Section 5–106." *Muntaqim v. Coombe*, No. 94–CV–1237, at 12 (N.D.N.Y. Jan. 24, 2001). The Court reasoned:

> While it is true that the Civil War Amendments such as the Fourteenth and Fifteenth Amendments, as well as the [Voting Rights Act], significantly intrude upon the authority of States in circumstances where discriminatory practices are apparent, these provisions were enacted during a time when felon disenfranchisement statutes were already firmly established and firmly recognized as an appropriate exercise of state authority. *See Baker*, 85 F.3d at 931 [ (Mahoney, J.) ]. Further, the Court agrees with the concerns raised by the five Judges in *Baker* who found that the

---

11. In stating the relevant issue as whether § 1973 may be applied to "racial discrimination *among* felons," *Baker*, 85 F.3d at 942 (Newman, C.J.) (emphasis added), Judge Newman appears to have been referring to the plaintiffs' contention in *Baker* that § 5–106 discriminates not by disenfranchising felons generally, but, rather, by disenfranchising only those felons who have been sentenced to a term of imprisonment and still remain incarcerated or on parole (as opposed to all felons and former felons, for example). *See Baker*, 85 F.3d at 937 (Feinberg, J.) ("Plaintiffs here allege that § 5–106, which disenfranchises only *some* felons, discriminates among felons *based on race*.") (emphasis in original).

application of the "results test" to a state disenfranchisement provision poses a "serious constitutional question concerning the scope of Congress' power to enforce the Fourteenth and Fifteenth Amendments." *Baker*, 85 F.3d at 930 [Mahoney, J.]. The application of the [Voting Rights Act] to Section 5–106 seemingly works to undermine the constitutional balance that exists between federal and state governments. Consequently, an "unmistakably clear" statement by Congress stating their intention to alter this balance must be provided. *Baker*, 85 F.3d at 931 [Mahoney, J.]

*Id.* Having found no "unmistakably clear" statement by Congress that it intended to undermine the constitutional balance between States and the Federal Government, the District Court held that § 1973 is inapplicable to felon disenfranchisement statutes such as § 5–106.

### C. *Johnson and Farrakhan*

In contrast to the District Court in the instant case, two of our sister circuits have recently held that § 1973 applies to felon disenfranchisement statutes.[12] In *Johnson v. Governor of Florida*, 353 F.3d 1287 (11th Cir.2003), a divided panel of the Eleventh Circuit, over a dissent by Judge Phyllis A. Kravitch, reinstated claims that the felon disenfranchisement provision of

the Florida Constitution[13] violates both the Equal Protection Clause and § 1973. In reinstating the § 1973 claim, Judge Rosemary Barkett, writing for the panel, rejected the district court's conclusion that "'it is not racial discrimination that deprives felons, black and white, of their right to vote but their own decision to commit an act for which they assume the risks of detection and punishment.'" *Johnson*, 353 F.3d at 1305 (quoting *Johnson v. Bush*, 214 F.Supp.2d 1333, 1341 (S.D.Fla.2002)). According to the Court, "[t]his conclusion ... only begs the question. The proper question here is whether felon status 'interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives.'" *Id.* (quoting *Gingles*, 478 U.S. at 47, 106 S.Ct. 2752). The Eleventh Circuit thus directed the district court, on remand, to consider plaintiffs' "evidence of discrimination in the criminal justice system" and to evaluate their § 1973 claim by "looking to the totality of the circumstances." *Id.* at 1306.

The *Johnson* majority assumed, but did not expressly state, that § 1973 applies to felon disenfranchisement statutes. By contrast, in her dissent, Judge Kravitch concluded that "the Voting Rights Act does not apply to felon disenfranchisement provisions." *Id.* at 1314 (Kravitch, J., dis-

**12.** Although the Fourth and Sixth Circuits have addressed similar claims, and apparently assumed that § 1973 applies to felon disenfranchisement statutes, neither Court expressly considered whether felon disenfranchisement statutes are exempted from § 1973. *See Howard v. Gilmore*, 205 F.3d 1333, 2000 WL 203984, at *1 (4th Cir.2000) (unpublished) (dismissing claim for failure to plead that Virginia's felon disenfranchisement law either was enacted with discriminatory intent or that there was "any nexus between the disenfranchisement of felons and race") (citation to unpublished dispositions in the Fourth Circuit is "disfavored"

but permissible, *see* U.S.Ct. of App. 4th Cir. Rule 36(c)); *Wesley v. Collins*, 791 F.2d 1255, 1259–61 (6th Cir.1986) (assuming the applicability of § 1973 to state felon disenfranchisement statutes but concluding that "in the context of the 'totality of the circumstances,' it is apparent that the challenged legislation does not violate the Voting Rights Act").

**13.** Unlike New York's *disenfranchisement* statute, which disenfranchises inmates and parolees only, the Florida Constitution *permanently* disenfranchises convicted felons unless they receive clemency. Fla. Const. art. VI, § 4.

senting). Judge Kravitch began by citing the "long-standing rule of statutory interpretation that federal courts should not construe a statute to create a constitutional question unless there is a clear statement from Congress endorsing this understanding." *Id.* at 1315. In light of that rule, Judge Kravitch described her preferred method of resolving the appeal as follows: "[W]e should first address whether one interpretation [of § 1973] presents grave constitutional questions where other interpretations would not, and then examine whether the latter interpretation is clearly contrary to Congressional intent." *Id.*

Judge Kravitch went on the conclude that "the majority's interpretation creates a serious constitutional question by interpreting the Voting Rights Act to trump the text of the Fourteenth Amendment[,]" which in § 2 expressly sanctions felon disenfranchisement statutes. *Id.* Thus, Judge Kravitch looked for a statement from Congress that it intended such a result. Instead, Judge Kravitch found that "the legislative history indicates just the opposite—that Congress did not intend the Voting Rights Act to apply to felon disenfranchisement provisions." *Id.* at 1316. Judge Kravitch observed first that the original Senate and House Reports both indicated that the VRA's bar on discriminatory tests or devices did not apply to state felon disenfranchisement laws. *See id.* Judge Kravitch also observed that, despite the amendment of the VRA in 1982, "[n]either the plain text nor the legislative history [of the amendments] plainly declares Congress's intent to extend the Voting Rights Act to felon disenfranchisement provisions." *Id.* at 1317.

In *Farrakhan v. Washington,* 338 F.3d 1009 (9th Cir.2003), a panel of the Ninth Circuit, like the Eleventh Circuit, held that a claim of vote denial based on Washington State's felon disenfranchisement scheme is cognizable under § 1973. Judge Richard A. Paez, writing for the panel, explained:

> Felon disenfranchisement is a voting qualification, and [§ 1973] is clear that *any* voting qualification that denies citizens the right to vote in a discriminatory manner violates the [Voting Rights Act]. 42 U.S.C. § 1973. Indeed, the Supreme Court has made clear that states cannot use felon disenfranchisement as a tool to discriminate on the basis of race, *see Hunter* [, 471 · U.S. at 233, 105 S.Ct. 1916], and Congress specifically amended the [Voting Rights Act] to ensure that, "in the context of all the circumstances in the jurisdiction in question," any disparate racial impact of facially neutral voting requirements did not result from racial discrimination, [S.Rep. No. 97–417, at 27 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 204–05]; *see also Chisom* [, 501 U.S. at 394 & n. 21, 111 S.Ct. at 2363 & n. 21].

> Permitting a citizen, even a convicted felon, to challenge felon disenfranchisement laws that result in either the denial of the right to vote or vote dilution on account of race animates the right that every citizen has of protection against racially discriminatory voting practices. Although states may deprive felons of the right to vote without violating the Fourteenth Amendment, when felon disenfranchisement results in denial of the right to vote or vote dilution on account of race or color, [§ 1973] affords disenfranchised felons the means to seek redress.

*Id.* at 1016 (citation omitted).

The Ninth Circuit rejected the argument that, because Congress did not isolate racial discrimination in the criminal justice system as a relevant factor in iden-

tifying § 1973 violations,[14] § 1973 cannot be applied to felon disenfranchisement statutes. According to the *Farrakhan* Court, Congress invited the courts to consider evidence of racial discrimination in the criminal justice system when it directed them to consider, as part of the totality of the circumstances test, " 'the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment, and health.' " *Farrakhan,* 338 F.3d at 1020 (quoting S.Rep. No. 97–417, at 29). The Court reasoned that "[t]his factor underscores Congress's intent to provide courts with a means of identifying voting practices that have the effect of shifting racial inequality from the surrounding social circumstances into the political process." *Id.* Drawing on the Supreme Court's language in *Gingles,* 478 U.S. at 47, 106 S.Ct. 2752, the Ninth Circuit thus concluded that "racial bias in the criminal justice system may very well interact with voter disqualifications to create the kinds of barriers to political participation on account of race that are prohibited by [§ 1973], rendering it simply another relevant social and historical condition to be considered where appropriate." *Id.*

Over the dissent of seven judges, the Ninth Circuit denied the defendant's petition for rehearing *in banc. See Farrakhan v. Washington,* 359 F.3d 1116, 1116

(9th Cir.2004) ("*Farrakhan II* "). Judge Alex Kozinski, writing for the dissenters, concluded that, by permitting the plaintiffs to bring a claim under the Voting Rights Act, "the panel lays the groundwork for the dismantling of the most important piece of civil rights legislation since Reconstruction." *Id.* at 1117. Judge Kozinski criticized the panel opinion on several grounds: First, Judge Kozinski argued that because "plaintiffs never produced a shred of evidence of *intentional* discrimination in Washington's criminal justice system," *id.* (emphasis added), but relied instead on statistical disparities in the felony conviction rates of certain minority groups in relation to the general population, the plaintiffs failed to present a genuine dispute of fact on a material issue. *Id.* at 1120. Second, and more importantly for our purposes, Judge Kozinski concluded that when Congress enacted the "results" test as part of the 1982 amendments to the VRA, "there is ... no evidence that Congress had changed its mind about the legitimacy of felon disenfranchisement." *Id.* at 1121. Instead, according to Judge Kozinski, Congress merely preserved the exception for felon disenfranchisement that it had carved out of the VRA in 1965. *See Id.* at 1120.

Finally, Judge Kozinski found that extending the VRA to reach felon disenfranchisement laws "seriously jeopardizes [the VRA's] constitutionality." *Id.* at 1121.

---

**14.** The Senate Report accompanying the 1982 Amendments to the Voting Rights Act identified some "typical factors" that may be relevant in determining whether, under the totality of the circumstances, a voting practice violates § 1973. These factors include: the history of voting-related discrimination in the jurisdiction; the extent to which voting in the jurisdiction is racially polarized; the extent to which the jurisdiction has used discriminatory voting practices in the past; the extent to which members of the minority group have been excluded from the candidate slating processes in the jurisdiction; the extent to which minority groups in the jurisdiction bear the effects of past discrimination in areas such as education, employment and health; the extent of the use of racial appeals in political campaigns within the jurisdiction; and the extent to which members of the minority group have been elected to public office in the jurisdiction. *See Gingles,* 478 U.S. at 44–45, 106 S.Ct. 2752 (citing S.Rep. No. 97–417, at 28–29). These factors are not, however, "comprehensive or exclusive." *Id.* at 45, 106 S.Ct. 2752.

Judge Kozinski explained first that because felon disenfranchisement statutes are endorsed in section 2 of the Fourteenth Amendment, "[t]hey are presumptively constitutional." *Id.* Indeed, "[o]nly a narrow subset of them—those enacted with an invidious, racially discriminatory purpose—is unconstitutional." *Id.* Judge Kozinski explained further that, under the Supreme Court's decision in *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), and its progeny, enforcement legislation under section 5 of the Fourteenth Amendment must be supported by a record of constitutional violations. *Id.* at 1122. The enactment of the "results" test, however, was not accompanied by any legislative findings concerning the use of felon disenfranchisement in an invidious manner. In Judge Kozinski's view, "[t]he theoretical, undocumented threat of unconstitutional felon disenfranchisement laws simply doesn't justify such a broad remedy [as section 2]." *Id.* at 1123.

### D. *Analysis*

■ After careful consideration of the opinions in *Baker,* the decision below, and the decisions of our sister circuits, we hold that § 1973 does not apply to § 5–106. In light of relevant Supreme Court precedents, including decisions of the Supreme Court that post-date *Baker,* we believe that the application of § 1973 to § 5–106 would alter the traditional balance of power between the States and the Federal Government. Accordingly, we conclude that, in the absence of a clear statement from Congress indicating Congress's intent to infringe upon the states' authority

to prohibit felons from voting, § 1973 should not be construed to extend to state felon disenfranchisement statutes. Having found no such clear statement in the language of § 1973, or even in its legislative history, we affirm the District Court's decision that Muntaqim's § 1973 claim fails as a matter of law.

### 1. The Clear Statement Rule

■ The canon of construction that is most relevant to our analysis has been called the Supreme Court's "super-strong clear statement rule." *See* William N. Eskridge, Jr. & Philip P. Frickey, *Foreword: Law as Equilibrium,* 108 Harv. L.Rev. 26, 82 (1994). Pursuant to this rule, "[i]f Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute." *Gregory,* 501 U.S. at 460–61, 111 S.Ct. 2395 (citations and internal quotation marks omitted). According to the Supreme Court, "[i]n traditionally sensitive areas, *such as legislation affecting the federal balance,* the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision." *Id.* at 461, 111 S.Ct. 2395 (citations and internal quotation marks omitted) (emphasis added). Thus, federal courts will construe a statute to alter the federal balance only when Congress expresses an "affirmative intention" to do so. *DeMarco v. Holy Cross High Sch.,* 4 F.3d 166, 169 (2d Cir.1993).[15]

---

**15.** The clear statement rule is closely related, but not identical, to the general constitutional avoidance canon. The Supreme Court summarized the constitutional avoidance canon in *DeBartolo Corp. v. Florida Gulf Coast Building and Construction Trades Council*: "[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988). A relevant difference between the clear statement rule and the con-

For the clear statement rule to apply here in the defendants' favor, we would need to conclude (1) that applying § 1973 to state felon disenfranchisment laws would alter the constitutional balance between the States and the Federal Government, and (2) that Congress has not made its intention to alter that balance *unmistakably clear.* Accordingly, the first step in our analysis is to determine if the application of § 1973 to state felon disenfranchisement would alter the federal balance. Assuming that § 1973 *does* raise the federalism concerns that implicate the clear statement rule, the next step is to determine if Congress has made its intent to press against constitutional boundaries unmistakably clear. Only if Congress made its intent sufficiently clear for the purposes of the clear statement rule do we need to resolve the constitutional question that divides the parties—namely, whether it is within Congress's power to ban state felon disenfranchisement statutes that do not directly violate the Reconstruction Amendments. If, on the other hand, Congress failed to make its intent sufficiently clear, we should not construe § 1973 to extend to felon disenfranchisement laws such as § 5–106.

## 2. The Scope of the Statute

Before we can decide whether the constitutional balance between the States and the Federal Government would be altered by the application of § 1973 to § 5–106, our first task is to determine what conduct is prohibited by § 1973. Unfortunately, it "is exceedingly difficult to discern what

[§ 1973] means." *Goosby v. Town Bd.,* 180 F.3d 476, 499 (2d Cir.1999) (Leval, J., concurring), *cert. denied,* 528 U.S. 1138, 120 S.Ct. 982, 145 L.Ed.2d 932 (2000).[16] On the one hand, despite the presence of the word "results" in § 1973, it is apparent that § 1973 does not prohibit *all* voting restrictions that have a racially disproportional effect. *See Gingles,* 478 U.S. at 47, 106 S.Ct. 2752 (holding that a violation of § 1973 occurs only when "a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives"). On the other hand, the main purpose of the 1982 amendment to the VRA was to establish that a state actor can violate the VRA without engaging in purposeful discrimination. *Id.* at 35, 106 S.Ct. 2752.

In enacting § 1973, Congress' decision to retain the words "on account of race or color" suggests "a continuing concern for race-based motivation, at least within the electorate." *See Goosby,* 180 F.3d at 499 (Leval, J., concurring). *But see* S.Rep. No. 97–417, at 27 n. 109 ("Congress has used the words 'on account of race or color' in the Act to mean 'with respect to' race or color, and not to connote any required purpose of racial discrimination."). The phrase "on account of" has been defined as "for the sake of: by reason of: because of." Webster's Third New International Dictionary 13 (1976). Mere evidence of a correlation between blacks and disenfranchised felons does not indicate

---

stitutional avoidance canon is discussed below. *See post,* note 22.

**16.** Judge Leval explained that "[t]he Supreme Court has offered no definitive guidance on the role of discriminatory intent under [§ 1973]." *Goosby v. Town Bd.,* 180 F.3d 476, 500 (2d Cir.1999) (Leval, J., concurring). In *Gingles,* in Part III.C of Justice Brennan's

opinion for a plurality of the Court, four Justices interpreted § 1973 to require no showing of intentional discrimination. *See Gingles,* 478 U.S. at 61–74, 106 S.Ct. 2752. But five Justices expressed different views. *See id.* at 83, 106 S.Ct. 2752 (White, J., concurring); *id.* at 100–01, 106 S.Ct. 2752 (O'Connor, J., concurring).

that black felons have been disenfranchised "by reason of" their race. Instead, such evidence proves only that a disproportional number of blacks have been disenfranchised "by reason of" their being felons. By contrast, evidence of racial discrimination in the prosecution or sentencing of felons *does* indicate that black felons' right to vote has been denied, at least in some part, "by reason of" their race. Thus, the language of § 1973, though hardly crystal clear, indicates that Congress did not wholly abandon its focus on purposeful discrimination when it amended the Voting Rights Act in 1982. *See Nipper v. Smith,* 39 F.3d 1494, 1515 (11th Cir.1994) (concluding, based on the words "on account of race or color," that "[t]he existence of some form of racial discrimination ... remains the cornerstone of [§ 1973] claims"); *League of United Latin Am. Citizens v. Clements,* 999 F.2d 831, 850 (5th Cir.1993) ("The scope of the Voting Rights Act is indeed quite broad, but its rigorous protections, as the text of [§ 1973] suggests, extend only to defeats experienced by voters 'on account of race or color.' ").

The legislative history of § 1973 also indicates that Congress did not wholly abandon its focus on purposeful discrimination when it amended the Voting Rights Act in 1982. As the Supreme Court explained in its plurality opinion in *Gingles,* 478 U.S. at 44 n. 8, 106 S.Ct. 2752 (citing S.Rep. No. 97–417, at 15–16), § 1973 was intended to overturn the plurality opinion in *Bolden* and restore the version of the "results test" used in *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973). In *White,* the Supreme Court *retained* proof of invidious discrimination as a requirement for a successful vote dilution claim brought under the Equal Protection Clause. 412 U.S. at 765–66, 93 S.Ct. 2332. However, instead of requiring the plaintiff to establish that the legislators who de-

signed the challenged election scheme subjectively intended to discriminate, the Court concluded that a constitutional violation could also be established based on "objective factors demonstrating that the electoral scheme interacts with racial bias in the community and allows that bias to dilute the voting strength of the minority group." *Nipper,* 39 F.3d at 1520 (discussing *White,* 412 U.S. at 766–67, 93 S.Ct. 2332). Based on the district court's finding that "Mexican–Americans in Texas[ ] had long 'suffered from, and continue[d] to suffer from, the results and effects of invidious discrimination and treatment in the fields of education, employment, economics, health, politics and others,' " 412 U.S. at 768, 93 S.Ct. 2332 (citation omitted), the Court went on to conclude that the impact of a multimember voting district on Mexican–Americans in Bexar County, Texas, constituted invidious discrimination, *id.* at 769–70, 93 S.Ct. 2332.

The *Bolden* plurality rejected the method of proving invidious discrimination endorsed in *White.* It stated instead that plaintiffs in voting rights cases, *including cases brought under § 1973,* "must prove that the disputed plan was conceived or operated as [a] purposeful devic[e] to further racial ... discrimination." *Bolden,* 446 U.S. at 66, 100 S.Ct. 1490 (internal quotation marks and citation omitted). In overturning *Bolden* by statute, Congress eliminated *Bolden*'s absolute requirement that plaintiffs establish a subjective discriminatory motive on the part of legislators. It does not follow, however, that Congress, in its 1982 amendments to the VRA, also eliminated *White*'s requirement that a plaintiff prove that an election law interacts with racial discrimination in order to establish a § 1973 claim. Rather, in light of the Senate Judiciary Committee's statement that "[t]he proposed amendment to section 2 of the Voting Rights Act is designed to restore the legal standard that

governed voting discrimination cases prior to the Supreme Court's decision in *Bolden*," S.Rep. No. 97–417, at 15, the more compelling inference is that Congress intended to endorse the framework laid out in *White. See generally Nipper*, 39 F.3d at 1517–20.

■ Accordingly, although § 1973, as amended in 1982, plainly does not require plaintiffs to prove that legislators acted with an invidious, discriminatory purpose in enacting a challenged voting rule, we conclude that § 1973, at least in the circumstances presented here, requires some demonstrable causal connection between a challenged voting rule and purposeful racial discrimination. Because we conclude that § 1973 is not applicable to § 5–106, we need not decide exactly how a plaintiff could prove this causal connection,[17] nor do we need to determine how direct the causal connection between racial discrimination and a challenged voting rule must be to meet the requirements of § 1973. For our purposes, it is enough to conclude that, based on both the language of the amended VRA and the statute's legislative history, a plaintiff must allege that racial discrimination has caused either vote denial or vote dilution; however, a plaintiff need not allege that the specific rule or qualification at issue was itself motivated by racial bias.

In the instant case, Muntaqim, who brought this action *pro se*, alleges that "gross racial disparity in New York's prison population is caused, at least in part, by race-based disparities *in sentencing*." Pl.'s Br. at 5 (emphasis added). Muntaqim thus asserts that, *as a result of racial discrimination in sentencing*, black and Hispanic felons are more likely to be sentenced to a term of imprisonment than white felons and are therefore more likely to be disenfranchised. Were we to conclude, therefore, that § 1973 extends to felon disenfranchisement statutes such as § 5–106, it would appear that Muntaqim has stated a valid § 1973 claim, albeit a claim that might not survive summary judgment once any evidence presented by Muntaqim is tested.[18]

### 3. The Federal Balance

In light of our interpretation of § 1973, it is readily apparent that the statute prohibits a broader category of legislation than the Reconstruction Amendments. Specifically, in contrast to the Equal Protection Clause of the Fourteenth Amend-

---

17. Clearly, the factors listed in the Senate Report accompanying the 1982 Amendments to the Voting Rights Act, *see* S.Rep. No. 97–417, at 28–29, would be probative, although we do not purport to analyze the relevance of each listed factor. We also do not purport to decide what type of statistical evidence might be sufficient to support an inference that racial bias exists at any given stage in the criminal process.

18. The defendants contended for the first time during oral argument that Muntaqim lacks standing to assert his vote dilution claim. Discriminatory vote dilution occurs when a voting practice diminishes "the force of minority votes that were duly cast and counted." *Holder*, 512 U.S. at 896, 114 S.Ct. 2581. Although our *in banc* Court in *Baker* did not address whether a prisoner has standing to assert a vote dilution claim, the issue of standing was addressed by the earlier panel opinion in that case. *See Baker v. Cuomo*, 58 F.3d 814, 824 (2d Cir.1995). The panel concluded that, because prisoners "have no vote at all ... they do not appear to have standing to raise a vote dilution claim on behalf of themselves as incarcerated felons." *Id.* However, the panel recognized that the prisoners may be "appropriate class representatives of minority voters generally." *Id.*

Because we conclude that § 1973 does not apply to § 5–106, we do not decide, nor must the District Court decide, whether Muntaqim would be a proper class representative for the class of minority voters who allegedly experience vote dilution as a result of § 5–106.

ment, the requirements of § 1973 can be satisfied *without* a showing that the specific voting rule at issue was enacted with a discriminatory purpose. In the instant case, for example, § 1973 merely requires Muntaqim to prove that he was subjected to invidious discrimination at sentencing, and does not require Muntaqim to prove that § 5–106 was enacted with a discriminatory purpose.

Because the "results" test of § 1973 reaches conduct that does not directly violate the Reconstruction Amendments, the crucial question is whether the application of § 1973 to § 5–106 is consistent with our federal system. Although our Court addressed this precise question in *Baker, see Baker*, 85 F.3d at 927 (Mahoney, J.); *id.* at 935 (Feinberg, J.); *id.* at 941 (Newman, C.J.), our task here is not simply to choose the opinion in *Baker* that we consider most persuasive. Rather, because, over the last seven years, the Supreme Court has substantially clarified the scope of Congress' enforcement power under the Reconstruction Amendments, it is incumbent upon us to look beyond *Baker* in order to evaluate the issue now presented in this case, as it comes to us fully seven years after *Baker*.

It was well established when our *in banc* Court split evenly in *Baker*, as it is now, that, in exercising its enforcement powers under the Reconstruction Amendments, Congress "may constitutionally prohibit practices that are not, considered in isolation, constitutional violations, but which perpetuate the effects of past purposeful discrimination." *Baker*, 85 F.3d at 927

(Mahoney, J.); *accord id.* at 937–38 (Feinberg, J.); *id.* at 941 (Newman, C.J.). However, when *Baker* was decided, the Supreme Court had not precisely delineated the scope of Congress's enforcement power under Section 5 of the Fourteenth Amendment. Thus, in *Baker*, in order to determine whether the application of § 1973 to § 5–106 was constitutionally permissible, we had to turn principally to *South Carolina v. Katzenbach*, 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966), *Katzenbach v. Morgan*, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966), and *City of Rome v. United States*, 446 U.S. 156, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980).[19] *See Baker*, 85 F.3d at 927–28 (Mahoney, J.); *id.* at 938 (Feinberg, J.). Although each of these Supreme Court decisions stands broadly for the proposition that Congress may enforce the substantive provisions of the Reconstruction Amendments by regulating conduct that does not directly violate those provisions, none of them purported to delineate the outer boundaries of Congress's authority.

Since the *Baker* litigation was completed in 1996, the Supreme Court has repeatedly considered the scope of Congress's enforcement power under the Reconstruction Amendments. In the words of one commentator, "the Rehnquist Court has [since 1997] introduced an entirely new framework for analyzing the scope of Congress's power under Section 5 of the Fourteenth Amendment 'to enforce, by appropriate legislation, the provisions of this article.'" Robert C. Post, *Foreword: Fashioning the*

---

**19.** In *South Carolina v. Katzenbach*, the Supreme Court rejected a challenge to the Voting Rights Act's coverage formula. 383 U.S. 301, 337, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966). In *Katzenbach v. Morgan*, the Court upheld a section of the Voting Rights Act that prevented states from denying the right to vote based on illiteracy to persons who completed sixth grade. 384 U.S. 641, 658, 86

S.Ct. 1717, 16 L.Ed.2d 828 (1966). In *City of Rome v. United States*, the Court refused to preclear proposed changes to the voting laws of the City of Rome, Georgia, because the City could not establish that its proposed changes did not have a discriminatory effect. 446 U.S. 156, 187, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980).

*Legal Constitution: Culture, Courts, and Law,* 117 Harv. L.Rev. 4, 11–12 (2003) (quoting U.S. Const. amend. XIV, § 5); *see also* Michael W. McConnell, *Institutions and Interpretation: A Critique of* City of Boerne v. Flores, 111 Harv. L.Rev. 153, 165 (1997) (explaining that, in 1997, the Court introduced a standard that is "more rigorous than the standard of review applied in earlier Section Five cases, such as *Katzenbach v. Morgan* ").

First, in *City of Boerne v. Flores,* 521 U.S. 507, 520, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), the Supreme Court held that Congress may exercise its enforcement powers under the Reconstruction Amendments only when it responds to a pattern of constitutional violations with a congruent and proportional remedy. Applying the congruence and proportionality test, the Supreme Court in *City of Boerne* concluded that the Religious Freedom Restoration Act of 1993 ("RFRA")—which prohibited "[g]overnment" from "substantially burden[ing]" a person's exercise of religion unless the government could demonstrate that the burden served a compelling governmental interest and was the least restrictive means of furthering that interest—was not appropriate legislation under § 5. 521 U.S. at 515–16, 536, 117 S.Ct. 2157. The Court noted first that in enacting RFRA, Congress did not document any "widespread pattern of religious discrimination in this country." *Id.* at 531, 117 S.Ct. 2157. The Court then held that, "[r]egardless of the state of the legislative record, RFRA cannot be considered remedial, preventive legislation" because it "is so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." *Id.* at 532, 117 S.Ct. 2157.

In *Board of Trustees of the University of Alabama v. Garrett,* 531 U.S. 356, 368, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001), the Court elaborated on *City of Boerne* when it explained that Congress cannot enact "appropriate" Section 5 legislation unless it has "identified a history and pattern of unconstitutional ... state transgressions." Under *Garrett,* it is incumbent upon Congress to document state violations of *judicially* protected rights before it enacts enforcement legislation under Section 5. *See id.* (Americans with Disabilities Act did not validly abrogate states' sovereign immunity because "[t]he legislative record... simply fails to show that Congress did in fact identify a pattern of irrational state discrimination in employment against the disabled"); *see also Kimel v. Fla. Bd. of Regents,* 528 U.S. 62, 89, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) (Age Discrimination in Employment Act did not validly abrogate the states' sovereign immunity because "Congress never identified any pattern of age discrimination by the States, much less any discrimination whatsoever that rose to the level of constitutional violation").

Accordingly, the law of federal-state relations has been significantly refined since our Court split evenly in *Baker.* Although the basic principle that "Congress may enact so-called prophylactic legislation that proscribes facially constitutional conduct," *Nev. Dep't of Human Res. v. Hibbs,* 538 U.S. 721, 727–28, 123 S.Ct. 1972, 1977, 155 L.Ed.2d 953 (2003), has not been disturbed, it is now clear that, in order for prophylactic legislation to pass constitutional muster, "there must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *City of Boerne,* 521 U.S. at 520, 117 S.Ct. 2157. Moreover, Congress must "identif[y]" the "history and pattern of unconstitutional ... discrimination" that it seeks to redress. *Garrett,* 531 U.S. at 368, 121 S.Ct. 955. These overlapping requirements help

federal courts "distinguish appropriate prophylactic legislation from 'substantive redefinition of the Fourteenth Amendment right at issue.'" *Hibbs,* 538 U.S. 728, 123 S.Ct. at 1977–78 (quoting *Kimel,* 528 U.S. at 81, 120 S.Ct. 631).

In applying *City of Boerne* and its progeny to the instant case, we note at the outset that we do not in any way cast doubt on Congress's authority to enact the Voting Rights Act. In a series of recent cases in which sections of federal statutes have been invalidated on the ground that they exceeded Congress's enforcement power under Section 5 of the Fourteenth Amendment, the Court has singled out the Voting Rights Act as a statute that satisfies the "congruence and proportionality" test for "appropriate legislation." *See, e.g., Garrett,* 531 U.S. at 373, 121 S.Ct. 955 (distinguishing Americans with Disabilities Act from VRA); *Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank,* 527 U.S. 627, 640, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999) (distinguishing Patent Remedy Act from VRA); *City of Boerne,* 521 U.S. at 526, 117 S.Ct. 2157 (distinguishing Religious Freedom Restoration Act from VRA). In each of these cases, the Court has emphasized that, when the Voting Rights Act was enacted, there was a vast and undisputed record of racial discrimination confronting Congress in the area of voting rights. *See, e.g., City of Boerne,* 521 U.S. at 530, 117 S.Ct. 2157.

Moreover, we do not purport to decide whether "as a *general rule,* the 'results' methodology of § 1973 is constitutionally valid." *Baker,* 85 F.3d at 928 n. 12 (Mahoney, J.) (emphasis in original). As Justice O'Connor noted in an effort to provide lower courts with "more definite guidance as they toil with the twin demands of the Fourteenth Amendment and the VRA," the Supreme Court has assumed—but never decided—that § 1973 is constitutional, and "lower courts have unanimously af-

firmed its constitutionality." *Bush v. Vera,* 517 U.S. 952, 990–91, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996) (O'Connor, J., concurring). According to Justice O'Connor, "[Congress] believed that without the results test, nothing could be done about 'overwhelming evidence of unequal access to the electoral system,' or about 'voting practices and procedures [that] perpetuate the effects of past purposeful discrimination.'" *Id.* at 992, 116 S.Ct. 1941 (quoting S.Rep. No. 97–417, at 26, 40 (citations omitted)). Justice O'Connor thus suggested that lower courts should accept and apply § 1973 "unless and until current lower court precedent is reversed and it is held unconstitutional." *Id.*

Consistent with Justice O'Connor's suggestion, the courts of appeals that have squarely addressed the issue have concluded that § 1973, on its face, meets the requirements for "appropriate legislation" under the Fourteenth and Fifteenth Amendments. *See Mixon v. Ohio,* 193 F.3d 389, 398–99 (6th Cir.1999); *United States v. Marengo County Comm'n,* 731 F.2d 1546, 1556–63 (11th Cir.1984); *Jones v. City of Lubbock,* 727 F.2d 364, 372–75 (5th Cir.1984). We do not doubt this conclusion. The question before us is not whether Congress exceeded its authority when it enacted § 1973; rather, it is whether Congress would exceed its authority if § 1973 were applied to state felon disenfranchisement statutes.

These questions are distinct because, in our view, felon disenfranchisement statutes cannot be conflated with other facially neutral voting rules that might fall within the ambit of § 1973. First, it is indisputable that "[u]nder our federal system, the States possess primary authority for defining and enforcing the criminal law." *United States v. Lopez,* 514 U.S. 549, 561 n. 3, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (internal quotation marks and citations

omitted). Likewise, "[t]he states have the primary responsibility for regulating the times, places, and manner of conducting federal elections [under] U.S. Const. art. 1, § 4, cl. 1, *and even more obviously for regulating elections to state office.*" *Baker*, 85 F.3d at 931 (Mahoney, J.) (emphasis added). Well before *City of Boerne* was decided, the Supreme Court held that Congress exceeded its authority when it enacted an amendment to the VRA prohibiting the disenfranchisement of 18–year–olds in *state and local* elections. *See Oregon v. Mitchell*, 400 U.S. 112, 118, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970), *superseded by* U.S. Const. amend. XXVI. Justice Black, writing for himself in a case that generated five separate opinions, explained the Court's decision as follows:

> Since Congress has attempted to invade an area preserved to the States by the Constitution without a foundation for enforcing the Civil War Amendments' ban on racial discrimination, I would hold that Congress has exceeded its powers in attempting to lower the voting age in state and local elections.

*Id.* at 130, 91 S.Ct. 260. In the absence of a record compiled by Congress establishing that felon disenfranchisement laws have been used to discriminate against minority voters, Justice Black's analysis applies as much to felon disenfranchisement laws as it does to state laws governing the minimum voting age. If New York State uses disenfranchisement merely as a tool to punish people who violate its laws, the application of § 1973 to § 5–106 would upset " 'the sensitive relation between federal and state criminal jurisdiction.' " *United States v. Enmons*, 410 U.S. 396, 411–12, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973) (quoting *United States v. Bass*, 404 U.S. 336, 349, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971)). Moreover, just as the mandated enfranchisement of 18–year olds would infringe upon the states' traditional authori-ty over its own elections, so too would the application of § 1973 to state voting laws such as § 5–106.

Additionally, "[a State's] discretion to deny the vote to convicted felons is fixed by the text of § 2 of Fourteenth Amendment," *Johnson*, 353 F.3d at 1314 (Kravitch, J., dissenting), which says that a state's representation in the House of Representatives and the Electoral College will not be reduced because its felons have been disenfranchised, *see* U.S. Const. amend. XIV, § 2. In *Richardson v. Ramirez*, 418 U.S. 24, 43–52, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974), the Supreme Court relied on Section 2 of the Fourteenth Amendment to reject a nonracial equal protection challenge to provisions of the California Constitution that permanently disenfranchise certain felons. The Court concluded "that those who framed and adopted the Fourteenth Amendment could not have intended to prohibit outright in [the Equal Protection Clause of] § 1 of that Amendment that which was expressly exempted from the lesser sanction of reduced representation imposed by § 2 of the Amendment." *Id.* at 43, 94 S.Ct. 2655. The same logic applied in *Richardson* to Section 1 of the Fourteenth Amendment can be extended to Section 5. It would be anomalous if the drafters and ratifiers of the Fourteenth Amendment, despite protecting felon disenfranchisement laws from the sanction of reduced representation, would allow Congress to *prohibit* some of these laws even when they were not passed with any discriminatory intent, and in the absence of a legislative record of intentional voting rights discrimination through felon disenfranchisement. *Cf. Farrakhan II*, 359 F.3d at 1121 (Kozinski, J., dissenting from denial of rehearing *in banc*) (noting that felon disenfranchisement laws "are presumptively constitutional" because they are "explicitly endorsed

by the text of the Fourteenth Amendment").[20]

Finally, there is a longstanding practice in this country of disenfranchising felons as a form of punishment. When the Fourteenth Amendment was ratified, 29 of 36 States had provisions in their constitutions which prohibited, or authorized the legislature to prohibit, exercise of the franchise by persons convicted of felonies or infamous crimes. *Richardson,* 418 U.S. at 48, 94 S.Ct. 2655. Today, as in the Early Republic, nearly every state disenfranchises felons. *See Developments in the Law: One Person, No Vote: The Laws of Felon Disenfranchisement,* 115 Harv. L.Rev. 1939, 1942 (2002) (noting that, as of 2002, every state in the union besides Maine and Vermont disenfranchised felons to some extent).

The prevalence of felon disenfranchisement before the Civil War indicates that felon disenfranchisement laws in most states were not enacted to evade the Reconstruction Amendments. Judge Friendly explained the nondiscriminatory purpose of the early disenfranchisement laws as follows:

> The early exclusion of felons from the franchise by many states could well have rested on Locke's concept, so influential at the time, that by entering into society every man "authorizes the society, or which is all one, the legislature thereof, to make laws for him as the public good of the society shall require, to the execution whereof his own assistance (as to his own decrees) is due." ... On a less

theoretical plane, it can scarcely be deemed unreasonable for a state to decide that perpetrators of serious crimes shall not take part in electing the legislators who make the laws, the executives who enforce these, the prosecutors who must try them for further violations, or the judges who are to consider their cases.

*Green v. Bd. of Elections,* 380 F.2d 445, 451 (2d Cir.1967) (citation omitted). In light of the prevalence of felon disenfranchisement laws in the Early Republic and throughout this country's history, there is no doubt that, when Congress passed the Voting Rights Act and its amendments, its members were aware of the nearly universal use of felon disenfranchisement as a punitive device. *Cf.* S.Rep. No. 89–162, at 24 (1965), *reprinted in* 1965 U.S.C.C.A.N. 2508, 2562 (noting that the prohibition of voting exclusions based on "moral character" has no bearing on "the frequent requirement of States ... that an applicant for voting or registration for voting be free of conviction of a felony"). To require Congress to make its intentions with respect to felon disenfranchisement clear would not impose an unreasonable or unrealistic burden on Congress, or one that Congress it is not accustomed to meeting. *See Hibbs,* 538 U.S. 729–32, 123 S.Ct. at 1978–80 (describing extensive record compiled by Congress to demonstrate the need for the family-care provision of the Family and Medical Leave Act). Indeed, considering the prevalence of felon disenfranchisement in every region of the country

---

**20.** That is not to say that the Fourteenth Amendment, as interpreted by the Supreme Court, *guarantees* states the power to disenfranchise felons. It is clear, for example, that if a state disenfranchises felons "with the intent of disenfranchising blacks," that state has run afoul of Section 1 of the Fourteenth Amendment. *See Hunter v. Underwood,* 471 U.S. 222, 229, 105 S.Ct. 1916, 85 L.Ed.2d 222

(1985) (invalidating disenfranchisement provision of Alabama Constitution passed with discriminatory intent); *Johnson,* 353 F.3d at 1301–02 (concluding that genuine dispute of material fact as to whether disenfranchisement provision in Florida's Constitution was enacted with a non-discriminatory purpose precluded summary judgment on Equal Protection challenge to provision).

since the Founding, it seems unfathomable that Congress would silently amend the Voting Rights Act in a way that would affect them. *Cf. Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 343, 119 S.Ct. 765, 142 L.Ed.2d 797 (1999) (plurality opinion) ("[I]t tests the limits of reason to suggest that despite [their] silence [on the issue], Members of Congress ... intended to enact what would arguably be the single most significant change in the method of conducting the decennial census since its inception.").

For these reasons, we believe that § 1973 cannot be constitutionally applied to New York's felon disenfranchisement statute merely because it may be constitutionally applied to other facially neutral voting restrictions. Instead, *City of Boerne* and its progeny dictate that the application of § 1973 to § 5–106 can be upheld only if two conditions are met: First, "[t]here must be a congruence and proportionality between the injury to be prevented or remedied [by § 1973]" and the prohibition of nondiscriminatory felon disenfranchisement laws. *City of Boerne*, 521 U.S. at 520, 117 S.Ct. 2157. Second, Congress must have identified a "history and pattern of unconstitutional ... discrimination" that would be deterred or prevented by prohibiting or limiting the power of states to disenfranchise incarcerated felons. *Garrett*, 531 U.S. at 368, 121 S.Ct. 955.

When Congress amended the Voting Rights Act in 1982, it was responding to a well-documented problem—namely, that State legislators motivated by racial animus were avoiding the strictures of the Voting Rights Act by enacting facially neutral election laws that disproportionally affected black voters. According to the Senate Report accompanying the 1982 amendments, the Voting Rights Act of 1965, rather than eliminating all discrimination in the electoral system, prompted a new wave of discrimination: "A broad array of dilution schemes were employed to cancel the impact of the new black vote." S.Rep. No. 97–417, at 6. Recognizing the continued threat of discrimination through veiled dilution schemes, and in response to the Supreme Court's narrow reading of the 1965 Act in *Bolden*, Congress decided that the goals of the Voting Rights Act could not be achieved if judicial findings of discriminatory purpose were required to establish a claim under Section 2 of the Act. *See id.* at 36.

However, by banning *all* neutral devices that "interact[ ] with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters[,]" *Gingles*, 478 U.S. at 47, 106 S.Ct. 2752, Congress chose a blunt tool to address the problem it identified. First, as opposed to the "results" test in § 1973c,[21]

21. The section provides, in relevant part:

Whenever a State or political subdivision with respect to which the prohibitions set forth in section 4(a) [42 USCS § 1973b(a) ] based upon determinations made under the first sentence of section 4(b) [42 USCS § 1973b(b) ] are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964, or whenever a State or political subdivision with respect to which the prohibitions set forth [42 U.S.C. § 1973b(a) ] based upon determinations made under the second sentence of [42 USCS § 1973b(b) ] are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1968, or whenever a State or political subdivision with respect to which the prohibitions set forth in [42 U.S.C. § 1973b(a) ] based upon determinations made under the third sentence of [42 U.S.C. § 1973b(b) ] are in effect shall enact or seek to administer any voting qualification or

which applies only in jurisdictions that require enhanced voting rights scrutiny as a result of verifiable Executive Branch findings, the current version of § 1973 applies nationwide. Second, the current version of § 1973 makes no distinction between practices that evolved after the enactment of the Voting Rights Act and practices that predated the Voting Rights Act or even the Reconstruction Amendments. Even if § 1973, as amended in 1982, represents a "congruent and proportional" response to voting rules developed in direct response to the VRA, or to rules enacted in jurisdictions with a record of intentional voting rights discrimination, we are doubtful that § 1973 can be constitutionally applied to § 5–106. The link between the injury to be prevented by Congress—namely, the use of various dilution schemes by certain states to avoid the strictures of the VRA— and Congress's supposed remedy—namely, the prohibition of *any* felon disenfranchisement law enacted at *any* time in *any* state that "results" in the abridgement of the right to vote on account of race—is too attenuated. *See City of Boerne*, 521 U.S. at 531, 117 S.Ct. 2157 (striking down statute that was "out of proportion to a supposed remedial or preventive object").

Further, *Garrett* indicates that, in order to prohibit felon disenfranchisement laws that were not enacted with a discriminatory purpose, it would be incumbent upon Congress to compile a record of intentional voting rights discrimination that could be directly deterred or prevented by invalidating those laws. *See Garrett*, 531 U.S. at 369–71, 121 S.Ct. 955; *United States v. Morrison*, 529 U.S. 598, 620–22, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000); *cf. Oregon*, 400 U.S. at 130, 91 S.Ct. 260 (Black, J.) (invalidating voting-age provision of VRA because, *inter alia*, "Congress made no legislative findings that the 21–year–old vote requirement was used by the States to disenfranchise voters on account of race"). And yet Congress has never put forward such evidence, or even *asserted* that felon disenfranchisement statutes have been used as a tool to discriminate against minority voters. *See Farrakhan II*, 359 F.3d at 1123 (Kozinski, J., dissenting from denial of rehearing *in banc* ) (noting the complete absence of "evidence that states were using felon disenfranchisement in a purposeful, invidious manner" prior to 1982). Rather, "the *only* consideration of felon disenfranchisement statutes in the entire history of the Voting Rights Act ... is Congress' explicitly announced intention *to exclude* such statutes from the § 1973b(c) tabulation of prohibited tests

prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1972, such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification prerequisite, standard, practice, or procedure does not have the purpose and *will not have the effect of denying or abridging the right to vote on account of race or color*, or in contravention of the guarantees set forth in section [42 U.S.C. § 1973b(f)(2)], and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure ....

42 U.S.C. § 1973c (emphasis added). Section 1973b(b), in turn, sets forth a two-part test used to determine whether § 1973c can be applied in a specific jurisdiction. For a jurisdiction to meet the requirements of § 1973b(b), the Attorney General of the United States has to determine that the jurisdiction in question has employed at least one of four specifically enumerated tests or devices with respect to voter qualification on November 1, 1964, November 1, 1968, or November 1, 1972. Then, the Director of the Census has to determine that fewer than fifty percent of the jurisdiction's voting age population (1) was registered to vote on the coverage date, or (2) voted in the presidential election that occurred in the November that includes the coverage date. *See* § 1973b(b).

and devices." *Baker*, 85 F.3d at 932 (Mahoney, J.) (second emphasis added); *see also Johnson*, 353 F.3d at 1316–17 (Kravitch, J., dissenting) (explaining that both the House and Senate Reports on the original Act indicated that the VRA was not designed to apply to felon disenfranchisement). Ultimately, the best evidence available that felon disenfranchisement has been used to discriminate based on race comes not from Congress but from the Supreme Court, which concluded in *Hunter* that the disenfranchisement provision of the State of Georgia's Constitution, *passed in 1901*, was enacted with discriminatory intent. 471 U.S. at 233, 105 S.Ct. 1916. Although this evidence might be sufficient to support the regulation of disenfranchisement laws in Georgia, notwithstanding the absence of congressional findings, we do not think it is sufficient to support the regulation of felon disenfranchisement scheme in *all* fifty States. *See Morrison*, 529 U.S. at 626, 120 S.Ct. 1740 (holding that Violence Against Women Act was not a legitimate exercise of Congress' authority under Section 5 in part because "it applie[d] uniformly throughout the Nation" and "Congress' findings indicate that the problem of discrimination against the victims of gender-motivated crimes does not exist in all States, or even most States"); *see also Farrakhan II*, 359 F.3d at 1124 (Kozinski, J., dissenting from denial of rehearing *in banc*) ("The Supreme Court has emphasized that enforcement legislation should be geographically targeted when the threat of violations varies from place to place.").

In sum, we are not convinced that "there [is] a congruence and proportionality between the injury to be prevented or remedied," *i.e.*, the use of vote denial and dilution schemes to avoid the strictures of the Voting Rights Act of 1965, "and the means adopted to that end," *i.e.*, prohibition of state felon disenfranchisement laws

that result in vote denial or dilution but were not enacted with a discriminatory purpose. *City of Boerne*, 521 U.S. at 520, 117 S.Ct. 2157. Moreover, even if there were a sufficient nexus between the injury to be prevented by § 1973 and the application of § 1973 to § 5–106, Congress has not identified a "history and pattern of unconstitutional ... discrimination" through felon disenfranchisement that would support the prohibition of statutes such as § 5–106. *Garrett*, 531 U.S. at 368, 121 S.Ct. 955. Based on these conclusions, it is apparent to us that the application of § 1973 to § 5–106 would disturb the balance of power between the States and the Federal Government, as conceived by the Supreme Court.

### 4. Congress's Statement of Intent

Because we have concluded that the application of § 1973 to § 5–106 would alter the federal balance, the next question is whether Congress made its intention sufficiently clear that we need to address the constitutional issue posed in this case. In applying the clear statement rule, the Supreme Court has asked whether Congress has made its intent to alter the federal balance "unmistakably clear in the language of the statute." *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985). Based on this formulation, we conclude that the clear statement rule applies with full force to this case, and that § 1973 cannot be used to invalidate § 5–106.

The clear statement rule prevents Congress from altering the federal balance unless it expresses an "affirmative intention" to do so. *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 169 (2d Cir.1993); *see also Gregory*, 501 U.S. at 460, 111 S.Ct. 2395 (demanding that Congress make its intention "unmistakably clear in the lan-

guage of the statute" (internal quotation marks and citations omitted)). Thus, in *NLRB v. Catholic Bishop,* 440 U.S. 490, 507, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), the Supreme Court, invoking the clear statement rule, concluded that the National Labor Relations Board lacked jurisdiction over lay faculty members at Catholic high schools even though the Board had jurisdiction over "employers," and the term "employer" in the National Labor Relations Act, 29 U.S.C. § 152(2), clearly did not exempt church-operated schools. The Court determined that, because the application of the statute to church-operated schools would raise "serious First Amendment questions," *id.* at 504, 99 S.Ct. 1313, and Congress had made no specific, affirmative statement of its desire to raise those sensitive questions, *see id.,* the statute should be construed not to extend to church-operated schools.

Similarly, in *Gregory,* Missouri state court judges sought to invoke the federal Age Discrimination in Employment Act of 1967 ("ADEA"), *as amended,* 29 U.S.C. §§ 621–634, to invalidate a provision of the Missouri Constitution that compelled judges to retire at age seventy. *See Gregory,* 501 U.S. at 455, 111 S.Ct. 2395. Notwithstanding the ADEA's application to all state "employees," and the Court's observation that an exception applicable to "appointee[s] on the policymaking level" did not, on its face, seem to include judges, *id.* at 467, 111 S.Ct. 2395 (noting that including judges in that category would be "an odd way for Congress to exclude judges" from the reach of the statute), the Court rejected the judges' ADEA claim.

The *Gregory* Court, unlike the *Catholic Bishop* Court, suggested that a statute must be "ambiguous" before the clear statement rule can be applied to it. *Id.* at 470, 111 S.Ct. 2395. However, the Court found that the word "employee," despite its ordinary meaning, is sufficiently ambiguous *for the purposes of the clear state-*

*ment rule.* The Court reasoned that, "[i]n light of the ADEA's clear exclusion of most important public officials, it is at least ambiguous whether Congress intended that appointed judges nonetheless be included." *Id.* The *Gregory* Court thus suggested that when sweeping language in a statute would alter the federal balance were it given its full effect, that language should not be construed to alter the federal balance in the absence of a clear statement where Congress has otherwise indicated that it did not intend to achieve such a drastic result. This formulation of the clear statement rule is slightly different from the formulation in *Catholic Bishop,* according to which the clear statement rule applies whenever a statute alters the federal balance; however, as explained presently, the clear statement rule applies in the instant case under either formulation of the rule.

Like the Supreme Court in both *Catholic Bishop* and *Gregory,* we are faced with a statute, *i.e.,* § 1973, that sweeps broadly over a wide range of government conduct. Moreover, for the reasons laid out above, that statute would alter the federal balance if it were applied to felon disenfranchisement laws. Accordingly, under *Catholic Bishop,* § 1973 should not be applied to felon disenfranchisement laws in the absence of an unmistakably clear statement.

Under *Gregory,* the clear statement rule also applies with full force in the instant case, because there is ample evidence that Congress did not intend to prohibit felon disenfranchisement statutes when it enacted and amended the VRA. Indeed, as Judge Kravitch explained in her dissent in *Johnson,* the legislative history of the VRA and its amendments suggests that, were Congress to have considered the issue, it would have declined Muntaqim's invitation to apply § 1973 to § 5–106. *See Johnson,* 353 F.3d at 1317–18 (Kravitch, J., dissenting); *see also Farrakhan II,* 359

F.3d at 1120 (Kozinski, J., dissenting from denial of rehearing *in banc*) (concluding that "the VRA was never intended to reach felon disenfranchisement laws"). In 1965, both the House and the Senate Judiciary Committee Reports stated that section 4(c) of the Voting Rights Act, 42 U.S.C. § 1973b(c)—which bans any "test or device" that limits the ability to vote to those individuals with "good moral character"—does not prohibit felon disenfranchisement statutes. *See* S.Rep. No. 89–162, at 24; H.R.Rep. No. 89–439, at 25–26. In 1982, moreover, Congress did not indicate in any way that it wanted to bring felon disenfranchisement laws within the scope of the VRA, notwithstanding the prevalence of felon disenfranchisement laws. *See Johnson*, 353 F.3d at 1317–18 (Kravitch, J., dissenting) (noting that "[t]he Senate Report [in 1982], which goes into great detail on legislative intent, made no mention of felon disenfranchisement provisions"); *Farrakhan II*, 359 F.3d at 1121 (Kozinski, J., dissenting from denial of rehearing *in banc*) ("There is ... no evidence that Congress had changed its mind about the legitimacy of felon disenfranchisement when it enacted section 2."). Thus, although Congress has not expressly stated that § 1973 does not apply to felon disenfranchisement statutes, the one-sided legislative history of the VRA is sufficient to raise serious doubts about whether the statute can be applied to felon disenfran-

chisement statutes. Under *Gregory*, in which the Supreme Court applied the clear statement rule without such specific evidence that Congress intended to exclude state judges from the scope of the ADEA, the clear statement rule controls.[22]

Our view is not altered by the fact that, in *Chisom v. Roemer*, 501 U.S. 380, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991), the Supreme Court did not apply the clear statement rule before determining that the results test of § 1973 applies to the election of state judges. We are persuaded by the explanation offered by Judge Mahoney, who concluded that the *Chisom* Court's failure to mention the clear statement rule cannot be construed to mean that the rule should never be applied. As Judge Mahoney explained:

> Relying upon *Chisom*, Judge Feinberg states that "we have clear Supreme Court authority that the plain statement rule does *not* apply when determining coverage under § 2 of the Voting Rights Act." Upon closer examination, this "clear ... authority" turns out to be the Supreme Court's failure, without so much as a reference to the plain statement rule, to apply the rule in *Chisom*, a case involving the interpretation of the Voting Rights Act. *See* 501 U.S. at 390–404, 111 S.Ct. 2354. In light of the unequivocal language in *Gregory* that the plain statement rule does apply in the context of legislation passed pursuant to the enforcement clauses of the

---

**22.** By contrast, we are not certain that the general constitutional avoidance canon would apply in the instant case. Unlike the clear statement rule, which requires an *affirmative* statement of Congress's intent, the doctrine of constitutional avoidance merely requires "the absence of statutory ambiguity." ' *HUD v. Rucker*, 535 U.S. 125, 134, 122 S.Ct. 1230, 152 L.Ed.2d 258 (2002) (quoting *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 494, 121 S.Ct. 1711, 149 L.Ed.2d 722 (2001)). Section 1973, while vague, does not seem ambiguous. It states that "*[n]o* voting qualification or prerequisite to voting or stan-

dard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of *any citizen* of the United States to vote on account of race or color." 42 U.S.C. § 1973 (emphases added).

Although we doubt that the general avoidance canon would apply in the instant case, we need not decide that issue. Because we conclude that the Supreme Court's clear statement rule precludes Muntaqim's Voting Rights Act claim, there is no need to go through the academic exercise of applying another canon of construction.

Civil War Amendments, we decline to interpret this omission—made without any attempt to distinguish *Gregory*—as an instruction to the lower courts to refrain from applying *Gregory* in the context of the Voting Rights Act.

*Baker*, 85 F.3d at 932 (Mahoney, J.). Additionally, we respectfully disagree with the view that "application of § 2 of the Voting Rights Act to state judges, a result that can change district boundaries, is at least as much of an intrusion of federal authority into state affairs as the effort of plaintiffs here to apply § 2 in a way that, at most, might permit some felons to vote." *Id.* at 939 (Feinberg, J.). For the reasons explained above, we believe that felon disenfranchisement statutes—in light of their longstanding and widespread acceptance throughout the country, as reflected in the text of the Fourteenth Amendment—enjoy a presumption of constitutionality that is not necessarily attached to other voting rules.

Thus, in these circumstances, we conclude that the clear statement rule is applicable, despite the fact that, on its face, § 1973 extends to all voting qualifications. *Cf. Chisom*, 501 U.S. at 411, 111 S.Ct. 2354 (Scalia, J., dissenting) (noting that "in some circumstances," the clear statement rule "counter[s] ordinary meaning"). Because we find that Congress did not make an unmistakably clear statement that § 1973 applies to state felon disenfranchisement statutes, we will not apply § 1973 to § 5–106.

## IV. *Immunity*

█ To the extent that Muntaqim's complaint alleges claims against the defendants in their personal capacities, the complaint can be dismissed on the separate ground that defendants are entitled to qualified immunity. In light of our split decision in *Baker*, it was objectively rea-

sonable for them to have believed that § 5–106 could be lawfully enforced. *See, e.g., Mandell v. County of Suffolk*, 316 F.3d 368, 385 (2d Cir.2003) (a state official is entitled to qualified immunity "if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights"). Accordingly, Muntaqim's request for $5,000,000 in compensatory and punitive damages from defendants in their personal capacities would not survive a motion to dismiss even if we reached a different conclusion regarding the scope of § 1973.

Muntaqim's suit is also barred by the Eleventh Amendment to the extent that Muntaqim seeks damages against the defendants in their official capacities. *See, e.g., Ford v. Reynolds*, 316 F.3d 351, 354 (2d Cir.2003) ("The Eleventh Amendment bars the award of money damages against state officials in their official capacities."); *see also Edelman v. Jordan*, 415 U.S. 651, 678, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (holding that the Eleventh Amendment is "a jurisdictional bar" that "need not be raised in the trial court"). However, the defendants are not entitled to either Eleventh Amendment immunity or qualified immunity from suit insofar as Muntaqim seeks to enjoin state officials from enforcing § 5–106. *See Frew ex rel. Frew v. Hawkins*, —— U.S. ——, ——, 124 S.Ct. 899, 903, 157 L.Ed.2d 855 (2004) (excepting from the Eleventh Amendment suits for prospective, injunctive relief that allege an ongoing violation of federal law (citing *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908))); *African Trade & Info. Ctr., Inc. v. Abromaitis*, 294 F.3d 355, 360 (2d Cir.2002) (noting that qualified immunity is inapplicable to claims for injunctive relief). Accordingly, as opposed to his other requests for relief, which suffer from multiple deficiencies, Muntaqim's request for prospective injunctive relief is barred solely because § 1973 does not apply to § 5–106.

## CONCLUSION

Based on recent decisions of the United States Supreme Court, we conclude that § 1973 would alter the constitutional balance between the States and the Federal Government if it were construed to extend to state felon disenfranchisement statutes such as § 5–106. In the absence of a clear statement from Congress to support that construction of the statute, we hold that § 1973 does not extend to § 5–106, and affirm the judgment of the District Court.

This case raises a difficult question regarding the applicability of the Voting Rights Act's "results" test to a New York statute that disenfranchises currently incarcerated felons and parolees. More broadly, it also asks us to evaluate the impact of *City of Boerne* and its progeny on Section 2 the Voting Rights Act, and to apply the clear statement rule in an unfamiliar context. Accordingly, all three judges on this panel believe that the issues presented in this case are significant and, in light of the differing perspectives among and within the courts of appeals, warrant definitive resolution by the United States Supreme Court.