349 F.Supp.2d 638 (2004)
UNITED STATES of America, Plaintiff,
v.
$293,316 IN UNITED STATES CURRENCY, More or Less, and All Proceeds Traceable thereto Seized from Ali Sher Khan, $187,155 in United States Currency, More or Less, and All Proceeds Traceable thereto Seized from Akbar Ali Khan, and $35,112 in United States Currency, More or Less, and All Proceeds Traceable thereto Seized from Fazal Subhan, Defendants in Rem.
No. 03-CV-0278.
United States District Court, E.D. New York.
December 23, 2004.
*639 Roslynn R. Mauskopf, United States Attorney, Eastern District of New York by Laura D. Mantell, Assistant United States Attorney, Brooklyn, NY, for Plaintiff.
Donohue and Donohue by John Patrick Donohue, Esq., Philadelphia, PA, English & Smith by David Smith, Esq., Philadelphia, PA, for Defendants in Rem $293,316 in United States Currency, more or less, and all proceeds traceable thereto seized from Ali Sher Khan; $187,155 in United States Currency, more or less, and all proceeds traceable thereto seized from Akbar Ali Khan; and for Ali Sher Khan and Akbar Ali Khan.
Bernard H. Udell, Esq. by Bernard H. Udell, Esq., Brooklyn, NY, for Defendant in Rem $35,112 in United States Currency, more or less, and all proceeds traceable thereto seized from Fazal Subhan; and for Fazal Subhan.

MEMORANDUM, ORDER & JUDGMENT
WEINSTEIN, Senior District Judge.

I. Introduction

Ali Sher Khan, Akbar Ali Khan and Fazal Subhan (the "claimants") were convicted *640 of concealing more than $10,000 in currency and attempting to transfer that currency out of the United States in violation of section 5332(a) of title 31 of the United States Code. See United States v. Khan, 325 F.Supp.2d 218 (E.D.N.Y.2004). The government commenced civil forfeiture proceedings in rem for the entire amount of currency it seized that claimants allege is their own. It seeks summary judgment against the claimants who crossmove for return of all the currency they allege they own. The government also argues that forfeiture of the entire amount of seized currency of Fazal Subhan is required under section 5317 of title 31 of the United States Code. The remainder of the seized currency is attributed to innocent owners. It is not at issue.
Questions of first impression posed are whether: (1) forfeiture of the entire amount of seized currency is required under the civil forfeiture provision in section 5332(c) of title 31 of the United States Code, and (2) such forfeiture is subject to review under the Excessive Fines Clause of the Eighth Amendment or under section 983(g) of title 18 of the United States Code.
For the reasons stated below, the court holds that forfeiture under section 5332(c) is subject to review under the Excessive Fines Clause of the Eighth Amendment and under section 983(g) of title 18 of the United States Code. In this case, forfeiture of the entire amount of claimants' currency would be grossly disproportionate to the gravity of claimants' offenses. The court orders forfeiture of fifty percent of each claimant's currency.

II. Facts

Customs inspectors at John F. Kennedy Airport stopped Ali Sher Khan and Akbar Ali Khan on the jet-way as they were about to board a plane to Pakistan. An inspector explained to each of them the currency reporting requirements. He asked each to declare the amount of currency he was transporting, regardless of whether the currency belonged to him or to others for whom he was carrying it. On customs forms, Ali Sher Khan declared that he was carrying $12,800 and Akbar Ali Khan declared that he was carrying $9,800. Seized was approximately $293,316 from Ali Sher Khan and approximately $187,155 from Akbar Ali Khan. They were arrested by law enforcement officers.
Fazal Subhan had already boarded the flight. Inspectors explained to him the currency reporting requirements, including his obligation to declare amounts being carried on behalf of other persons. Subhan declared on a customs form that he was carrying $9,412. Approximately $35,112 was seized from him. He was arrested.
Each claimant was indicted on the following counts: (1) conspiracy to conceal more than $10,000 in currency in violation of 18 U.S.C. § 371 and 31 U.S.C. § 5332(a); (2) concealing more than $10,000 in currency in violation of 31 U.S.C. § 5332(a); and (3) making false statements to a government agent in violation of 18 U.S.C. § 1001(a)(2). Akbar Ali Khan and Fazal Subhan were each indicted on an additional count of failing to file a report when knowingly transporting and being about to transport more than $10,000 in currency out of the United States in violation of 31 U.S.C. §§ 5316(a)(1)(A), 5316(b) and 5322(a).
After a jury trial, Ali Sher Khan was convicted of all counts for which he was indicted; Akbar Ali Khan was convicted of all counts except making false statements to a government agent; and Fazal Subhan was convicted on all counts for which he was indicted. At sentencing leniency was *641 exercised in light of the fact that the cash was intended to help families in Pakistan with money earned legally in the United States, not to fund terrorist activity or for any other illegal purpose. See United States v. Khan, 325 F.Supp.2d 218, 220 (E.D.N.Y.2004). Much of the money was carried for friends and co-workersinnocent ownersto their Pakistani relatives.
The government filed this civil action in rem against the currency seized from the claimants, seeking forfeiture of all $515,583 seized pursuant to 31 U.S.C. § 5316 (requiring currency reporting of the transport of more than $10,000 in monetary instruments), § 5317 (providing for forfeiture of funds associated with a violation of the currency reporting law) and § 5332 (criminalizing the smuggling of non-reported currency in excess of $10,000 and providing for forfeiture of funds associated with such a violation). A summons and warrant for arrest of the articles in rem was issued pursuant to Rule C(3) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.
Notice of the action was published. Individually served were approximately eighty putative claimants. Some ninety claims were filed. Ali Sher Khan filed a claim for $87,000 that was amended to $67,000. Akbar Ali Khan filed a claim for $19,300. Fazal Subhan filed a claim that was amended to $10,000.

III. Law

A. Summary Judgment Standard

To prevail on a motion for summary judgment, the moving party must show that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Evidence is evaluated in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., All U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

B. Excessive Fines Clause

The Excessive Fines Clause of the Eighth Amendment provides that "excessive fines [shall not be] imposed." U.S. CONST, amend. VIII. "Fine," at the time the Constitution was adopted, was understood to mean "`a payment to a sovereign as punishment for some offense.'" United States v. Bajakajian, 524 U.S. 321, 327, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998) (quoting Browning-Ferris Indus, of Vt, Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 265, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989)). "The Excessive Fines Clause thus limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense." Austin v. United States, 509 U.S. 602, 609-10, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993) (emphasis added) (internal quotation marks omitted). The forfeitures now sought are "fines" under the Excessive Fines Clause. See Bajakajian, 524 U.S. at 328, 118 S.Ct. 2028. They may not be "excessive." See id. at 334, 118 S.Ct. 2028.
In Bajakajian, the government sought criminal forfeiture of the entire $357,144 that Bajakajian had failed to declare in violation of the currency reporting requirements of section 5316 of title 31 of the United States Code. Id. at 324-25, 118 S.Ct. 2028. The Court held that full forfeiture of the currency would violate the Excessive Fines Clause because "it would be grossly disproportional to the gravity of his offense." Id. at 324, 118 S.Ct. 2028.
The Court first considered whether the forfeiture of the currency was punishment. It concluded that the forfeiture, pursuant to section 982(a)(1) of title 18 of the United States Code, constitutes punishment because *642 it can only be imposed on a person who has been convicted of a reporting violation, not upon an innocent owner. Id. at 328, 118 S.Ct. 2028. It rejected the government's argument that the forfeiture also served remedial purposes, including deterrence, because deterrence "has traditionally been viewed as a goal of punishment" and forfeiture of the currency at issue did "not serve the remedial purpose of compensating the [government for a loss" of information regarding the amount of currency leaving the United States. Id. at 329, 118 S.Ct. 2028. It rejected the government's argument that the forfeiture fell within a class of historic forfeitures of property tainted by crime because it was based on inapposite cases involving traditional civil in rem forfeitures that were historically considered nonpunitive, whereas section 982(a)(1) descended from the historical tradition of in personam criminal forfeitures. Id. at 329-32, 118 S.Ct. 2028.
Since "some recent federal forfeiture laws have blurred the traditional distinction between civil in rem and criminal in personam forfeiture," the Supreme Court has held that "a modern statutory forfeiture is a `fine' for Eighth Amendment purposes if it constitutes punishment even in part, regardless of whether the proceeding is styled in rem or in personam." Id. at 331 n. 6, 118 S.Ct. 2028 (citing Austin, 509 U.S. at 621-22, 113 S.Ct. 2801). The Court rejected the government's argument that the forfeiture was constitutional because it involved an "instrumentality" of the crime, stating that it was irrelevant whether the currency was an instrumentality because the forfeiture is punitive. Id. at 333, 118 S.Ct. 2028. In dicta, the Court stated that, in any event, the currency was not an instrumentality because it was not used to commit an offense. See id. at 334 n. 9,118 S.Ct. 2028.
The Court then considered whether the fine was "excessive." It held that "a punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportion^ to the gravity of a defendant's offense." Id. at 334, 118 S.Ct. 2028 (emphasis added). In applying this standard, the court "must compare the amount of the forfeiture to the gravity of the defendant's offense." Id. at 336-37, 118 S.Ct. 2028. "If the amount of the forfeiture is grossly disproportional to the gravity of the defendant's offense, it is unconstitutional." Id. at 337, 118 S.Ct. 2028.

C. Civil Forfeiture Statutes

For the purposes of this case it is not necessary to analyze the reasons that the government might prefer civil to criminal forfeitures or the various court and administrative procedural routes available. See, e.g., JIMMY GURULE & SANDRA GUERRA, THE LAW OF ASSET FORFEITURE § 1-5 (1998) (comparing civil and criminal forfeitures).

1. Section 5332(c)

Section 5332(a) of title 31 of the United States Code provides that a currency smuggling offense is committed when a person, with the intent to evade a currency reporting requirement under section 5316, knowingly conceals more than $10,000 in currency and transports or attempts to transport that currency out of the United States. See 31 U.S.C.A. § 5332(a) (West 2003).
The civil forfeiture provision in section 5332(c) reads:
(1) In general.Any property involved in a violation of subsection (a), or a conspiracy to commit such violation, and any property traceable to such violation or conspiracy, may be seized and ... forfeited to the United States.

(2) Procedure.The seizure and forfeiture shall be governed by the procedures *643 governing civil forfeitures in money laundering cases pursuant to section 981(a)(1)(A) of title 18, United States Code.
(3) Treatment of certain property as involved in the offense.For purposes of this subsection and subsection (b), any currency or monetary instrument that is concealed or intended to be concealed in violation of subsection (a) or a conspiracy to commit such violation, any article, container, or conveyance used, or intended to be used, to conceal or transport the currency or other monetary instrument, and any other property used, or intended to be used, to facilitate the offense, shall be considered property involved in the offense.

31 U.S.C.A. § 5332(c) (West 2003) (emphasis added).
Section 5332 of title 31 of the United States Code, also referred to as the bulk cash smuggling statute, was enacted in October 2001 as part of the USA Patriot Act. USA Patriot Act, Pub.L. 107-56, Tit. Ill, § 371, 115 Stat. 272, 336-38 (2001). Recognizing that smuggling a large quantity of cash is "one of the most reliable warning signs of drug trafficking, terrorism, money laundering, racketeering, tax evasion and similar crimes," H.R. 3162, 107th Cong., § 371(a)(3) (2001) (enacted), Congress stated that the purposes of section 5332 are:
(1) to make the act of smuggling bulk cash itself a criminal offense;
(2) to authorize forfeiture of any cash or instruments of the smuggling offense; and
(3) to emphasize the seriousness of the act of bulk cash smuggling.
H.R. 3162, § 371(b).
In enacting section 5332, Congress suggested dissatisfaction with limitations placed on forfeiture amounts by United States v. Bajakajian. A Congressional finding reads:
The current penalties for violations of the currency reporting requirements are insufficient to provide a deterrent to the laundering of criminal proceeds. In particular, in cases where the only criminal violation under current law is a reporting offense, the law does not adequately provide for the confiscation of smuggled currency. In contrast, if the smuggling of bulk cash were itself an offense, the cash could be confiscated as the corpus delicti of the smuggling offense.
H.R. 3162, § 371(a)(6); see also Stefan D. Cassella, Bulk Cash Smuggling and the Globalization of Crime: Overcoming Constitutional Challenges to Forfeiture under 31 U.S.C. § 5332, 22 BERKELEY J. INT'L L. 98, 107 (2004) ("[P]icking up on the distinction between smuggling offenses and reporting violations in Bajakajian, Congress noted that as long as bulk cash smuggling was considered only a currency reporting offense, the penalties could not `adequately provide for the confiscation of smuggled currency.'").
Section 5332 criminalizes the unreported transport of large quantities of currency rather than merely the failure to report such transport, as under section 5316. Imposition of civil forfeiture under section 5332(c) is predicated on the commission of the crime of currency smuggling. See 31 U.S.C.A. § 5332(c)(1) ("Any property involved in a violation of subsection (a). ..." (emphasis added)). The procedures governing civil forfeitures under section 5332(c) are the same as those that govern money laundering cases. See 31 U.S.C.A. § 5332(c)(2) ("[P]ursuant to section 981(a)(1)(A) of title 18, United States Code"). These procedures are set out in section 983 of title 18 of the United States Code and are applicable to all federal civil *644 forfeitures except those specifically enumerated. See 18 U.S.C.A. § 983(i) (West 2000 & Supp.2004) (defining "civil forfeiture statute" to include all but five enumerated statutes). Neither section 5332 of title 31 of the United States Code nor section 981 of title 18 of the United States Code are enumerated and thus the procedures set out in section 983 are applicable. See id. Section 983 includes an innocent owner defense. 18 U.S.C.A. § 983(d) (West 2000 & Supp.2004).
The government argues that section 5332(c) of title 31 of the United States Code mandates civil forfeiture of all seized currency, without reduction. This argument is unconvincing.
The plain language of section 5332(c) belies the government's interpretation: the statute uses "may" rather than "shall." See 31 U.S.C.A. § 5332(c)(1) ("[A]ny property ... may be seized and... forfeited ...." (emphasis added)). In contrast, the parallel criminal forfeiture provision uses "shall." See 31 U.S.C.A. § 5332(b)(2) (West 2003) ("[T]he court ... shall order that the defendant forfeit ... any property." (emphasis added)). The text of section 5332(c) does not mandate civil forfeiture of the entire property seized.
Assuming arguendo that the statutory language is ambiguous, resort to the legislative history to discern the intent of Congress is unavailing. In the legislative history, Congress did not express a design to mandate, as opposed to permit, civil forfeiture of all property seized under section 5332. As Congress put it, a purpose of section 5332 is to "authorize" forfeiture. H.R. 3162, § 371(b)(2).
Arguably, if section 5332(c) mandated complete civil forfeiture, such a provision would be invalid under Bajakajian. To avoid a constitutional issue the more benign view of the statute should be adopted. See) e.g., Muntaqim v. Coombe, 366 F.3d 102, 115 n. 15 (2d Cir.2004) (discussing constitutional avoidance canon as summarized in DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988): "[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress."). Cf. generally, Sarah Newland, Note, The Mercy of Scalia: Statutory Construction and the Rule of Lenity, 29 HARV. C.R.-C.L. L.Rev. 197 (1994).
Forfeiture of currency under section 5332(c) constitutes punishment because it is predicated on the crime of currency smuggling and cannot be imposed upon an innocent owner. See Bajakajian, 524 U.S. at 328, 118 S.Ct. 2028; 18 U.S.C.A. § 983 (West 2000 & Supp.2004). The argument that forfeiture under section 5332(c) does not constitute punishment is based on a misreading of Bajakajian. That case's holding that the forfeiture was punitive was not based on whether currency is considered an instrumentality. See 524 U.S. at 333, 118 S.Ct. 2028 ("It is therefore irrelevant whether respondent's currency is an instrumentality; the forfeiture is punitive, and the test for the excessiveness of a punitive forfeiture involves solely a proportionality determination." (emphasis added)). Nor is the punitive nature of forfeiture under section 5332(c) distinguishable from that of the forfeiture in Bajakajian because the former is a civil in rem proceeding or is predicated on a smuggling, rather than reporting, offense. See Austin, 509 U.S. at 621-22, 113 S.Ct. 2801 (holding that a modern statutory fine is a "fine" if it constitutes punishment even in part regardless of whether the proceeding is in rem *645 or in personam (emphasis added)). The remedial purpose(s) of section 5332(c), whatever they may be, does not detract from the conclusion that it constitutes punishment at least in part. See id.
Unlike the gold platter in United States v. An Antique Platter of Gold, 184 F.3d 131, 140 (2d Cir.1999), the currency at issue is not "classic contraband, an item imported into [or exported from] the United States in violation of law." An Antique Platter of Gold involved false statements on customs forms regarding a gold platter's value and country of origin, which affected the imposition of customs duties and determination of whether the platter was stolen. Id. at 135-37. The false statements violated section 545 of title 18 of the United States Code, a customs law "traditionally viewed as non-punitive," id. at 140, and for which there is no innocent owner defense, id. at 138-39. Currency is not subject to any customs duties and its transport from (or into) the United States remains legal provided that the reporting requirements are met. Furthermore, section 5332(c) is subject to an innocent owner defense unlike the statute at issue in An Antique Platter of Gold, confirming the former's punitive nature.
The amount of civil forfeiture in this case is subject to review under the Excessive Fines Clause. Whether complete forfeiture in this case is "excessive" is addressed in Part V, infra.

2. Section 5317(c)(2)

The government argues that Subhan is liable to forfeit the entire amount he claims because of his currency reporting violation under section 5316 of title 31 of the United States Code. This argument is without merit.
The civil forfeiture provision in section 5317(c)(2) reads:
(2) Civil forfeiture.Any property involved in a violation of section 5313, 5316, or 5324 of this title, or any conspiracy to commit any such violation, and any property traceable to any such violation or conspiracy, may be seized and forfeited to the United States in accordance with the procedures governing civil forfeitures in money laundering cases pursuant to section 981(a)(1)(A) of title 18, United States Code.
31 U.S.C.A. § 5317(c)(2) (West 2003). Section 5316 requires the reporting of specified information when a person knowingly transports or is about to transport monetary instruments of more than $10,000 at one time out of the United States. See 31 U.S.C. § 5316 (2000). Civil forfeiture for a currency reporting offense, as provided in section 5317(c)(2), is subject to Excessive Fines Clause analysis. See Bajakajian, 524 U.S. 321, 118 S.Ct. 2028, 141 L.Ed.2d 314. The same analysis of whether the Excessive Fines Clause applies to section 5332(c) is applicable to section 5317(c)(2) forfeiture. See Part III. C.l, supra.

D. Amount of Forfeiture

In Bajakajia.n, the Court found that forfeiture of the entire amount seized would be grossly disproportionate to the gravity of Bajakajian's offense. 524 U.S. at 337, 118 S.Ct. 2028. The Court's finding was based on several factors, including: (1) the respondent's crime was "failing to report the wholly legal act of transporting his currency"he owed no customs duties to the government and it was legal for him to possess the currency in cash and to remove it from the United States; (2) his violation was unrelated to any other illegal activities and the currency was the proceeds of legal activity; (3) he did not fit into the class of person for whom the statute was principally designed, i.e., a money launderer, drug trafficker or tax *646 evader; (4) his maximum length of imprisonment was six months and maximum fine was $5,000 under the Sentencing Guidelines, which "confirm a minimal level of culpability"; and (5) the harm he caused was minimal in that his failure to report his currency affected only the government and in a relatively minor way in that the government "would have been deprived only of the information that $357,144 had left the country." Id. at 337-39, 338 n. 13, 118 S.Ct. 2028; see also United States v. Collado, 348 F.3d 323, 328 (2d Cir.2003) (per curiam) (discussing the factors considered by Bajakajian: "(a) `the essence of the crime' of the respondent and its relation to other criminal activity, (b) whether the respondent fit into the class of persons for whom the statute was principally designed, (c) the maximum sentence and fine that could have been imposed, and (d) the nature of the harm caused by the respondent's conduct"), cert. denied, ___, U.S. ___, 124 S.Ct. 1620, 158 L.Ed.2d 246 (2004). The Bajakajian Court also noted that the forfeiture sought by the government "is larger than the $5,000 fine imposed by the District Court by many orders of magnitude, and it bears no articulable correlation to any injury suffered by the Government." 524 U.S. at 340, 118 S.Ct. 2028.
Subsequent to Bajakajian, section 983 of title 18 of the United States Code was enacted as part of the Civil Asset Forfeiture Reform Act of 2000 (CAFRA), Pub.L. 106-185, § 2, 114 Stat. 202, 202-11 (2000) (enacted). As noted above, Part III.C.l., supra, section 983 sets out procedures for civil forfeitures and applies to almost all federal civil forfeitures. See 18 U.S.C.A. § 983(i). Section 983(g) sets out a proportionality test that in essence codifies Bajakajian: "[T]he court shall compare the forfeiture to the gravity of the offense giving rise to the forfeiture," to determine whether the forfeiture is constitutionally excessive. 18 U.S.C.A. § 983(g)(1), (2) (West 2000 & Supp.2004).
In short, forfeiture provisions generally are subject to excessive fine limitations and proportionality. The statutory provisions the government is proceeding on do not depart explicitly or implicitly from that norm, nor is there any policy reason to be more punitive in cases such as the instant one than Bajakajian and the Constitution permit.

IV. Practice of Courts regarding Forfeiture Amount

At this court's request, the government provided the following chart and accompanying explanation on the practice in federal courts throughout the country setting forfeiture amounts for currency reporting and bulk cash smuggling violations (the "Report"). Most forfeitures are, however, administrative in nature. See Report 1 nn. 2-3. The Report reads (footnotes omitted):
The following chart was prepared by U.S. Customs and Border Protection ("CBP") in response to the Court's request for information concerning judicial forfeitures of currency seized pursuant to 31 U.S.C. [§§] 5316 [and] 5317 ([currency and monetary instrument reporting, or] "CMIR" cases) and [§] 5332 ( [b]ulk cash smuggling into or out of the United States, or "BCS" cases). The information in the chart was obtained from a database (the "Database") maintained by the Fines, Penalties and Forfeitures ("FP & F") office of CBP that contains records of seizures at ports throughout the country. As more fully described below, the chart provides the requested information with respect to all judicial forfeitures that resulted from CMIR and BCS seizures that occurred *647 during the period beginning September 1999 through 2004.
To prepare the chart, the FP & F office generated spreadsheets of Database records for all forfeitures resulting from CMIR and BCS seizures during the relevant period, including judicial forfeitures (coded as either criminal, "JR," or civil, "JC"), settlements, and thousands of administrative forfeitures. The Database records set forth in the spreadsheets were grouped according to case numbers and included the following information: the date of the seizure, the statutory authority for the seizure, legal and physical status of the seized funds, types of monetary instruments, amounts seized, amounts refunded (from which the amount forfeited was determined), and the port where the seizure occurred. Some cases concerned more than one seizure of funds, such as where more than one type of monetary instrument was seized or where the funds were found in more than one location (e.g., luggage, person, carry-on baggage, within vehicle, etc.). To determine the amount forfeited in those cases, it was necessary to manually add the entire amount seized under a case number and then subtract from that amount the total amount refunded.
The information arrived at through the process described above appears to indicate a rate of 100% forfeiture in the majority of judicial forfeitures. As indicated in the chart, there is a high rate of forfeiture in criminal CMIR cases. The high rate of 100% forfeitures in civil cases may be attributed to default judgments or the inability of the claimant(s) in those cases to establish ownership or the legitimacy of the seized funds. Additionally, in cases where nominal amounts or only l%-2% of the seized funds were returned, it is likely that the government was able to establish liability to forfeit all of the seized funds but returned a nominal amount for humanitarian reasons at the time of the seizure. However, because it cannot be determined from the Database records the exact basis for the release or remission, CBP deducted those amounts from the total forfeiture reflected.
The Database does not contain records of how the court determined what percentage of the funds to forfeit or whether an Eighth Amendment challenge was raised by the criminal defendants) or claimant(s). As such, CBP cannot provide more information about cases in which less than 100% of the seized funds were forfeited. Forfeiture of less than 100% of the funds may be attributable to situations where the government could not establish liability under the statute, mitigation under the Eighth Amendment, multiple claimants to the same funds or other factors. Further information may only be obtained by conducting a manual review of individual case files, which are maintained at numerous CBP offices throughout the country. As such a review would be prohibitive in terms of the amount of manpower and resources it would require, we cannot provide further or more specific details regarding the forfeitures.
Cases marked with an asterisk indicate violations of 31 U.S.C. [§] 5332 were cited at the time of seizure. [It] cannot [be] determine[d] from the database records available whether a violation of 31 U.S.C. [§] 5332 was established in the final decrees of forfeiture.

*648
 DATE OF AMOUNT AMOUNT APPROXIMATE LEGAL PORT
 SEIZURE SEIZED FORFEITED PERCENTAGE STATUS LOCATION
(1) 9/10/99 32,152.00 31,200.00 97 JC JFK Int'la Airport, NY
(2) 9/28/99 11,472.75 10,325.75 90 JC Buffalo-Niagara Falls, NY
(3) 9/29/99 61,453.97 60,953.97 99 JC Buffalo-Niagara Falls, NY
(4) 10/6/99 1,180,959.32 1,180,959.32 100 JC Detroit, MI
(5) 10/27/99 21,847.00 121,847.00 100 JC Newark, NJ
(6) 12/6/99 48,155.00 148,155.00 100 JC Newark, NJ
(7) 12/16/99 16,033.00 116,033.00 100 JR Newark, NJ
(8) 1/2/00 51,302.00 123,606.70 81 JC Atlanta, GA
(9) 1/8/00 50,580.00 250,580.00 100 JR Newark, NJ
(10) 1/10/00 06,020.00 106,020.00 100 JR Blaine, WA
(11) 1/23/00 50,016.00 50,016.00 100 JR Miami Int'l Airport, FL
(12) 1/23/00 33,891.00 33,891.00 100 JR Miami Int'l Airport, FL
(13) 1/25/00 377,482.66 364,918.53 96 JC Detroit, MI
(14) 1/31/00 12,012.00 12,012.00 100 JR Miami Int'l Airport, FL
(15) 1/31/00 15,695.00 15,695.00 100 JR Miami Int'l Airport, FL
(16) 1/31/00 19,011.00 19,011.00 100 JR Miami Int'l Airport, FL
(17) 2/1/00 76,723.00 76,723.00 100 JC Miami Int'l Airport, EL
(18) 2/1/00 93,393.00 93,393.00 100 JC Miami Int'l Airport, FL
(19) 2/1/00 71,397.00 71,397.00 100 JC Miami Int'l Airport, FL
(20) 2/9/00 55,089.00 55,089.00 100 JR San Ysidro, CA
(21) 2/10/00 93,880.00 93,880.00 100 JR Miami Int'l Airport, FL
(22) 3/2/00 50,640.00 50,640.00 100 JR Miami Int'l Airport, FL
(23) 3/28/00 113,760.00 108,760.00 95 JC Lynden, WA
(24) 3/29/00 11,663.00 10,477.00 89 JC Roma, TX
(25) 3/29/00 82,320.00 82,320.00 100 JC Roma, TX
(26) 4/9/00 19,694.00 19,694.00 100 JR Miami Int'l Airport, FL
(27) 4/15/00 40,956.00 40,956.00 100 JR Miami Int'l Airport, FL
(28) 4/15/00 40,400.00 40,400.00 100 JR Miami Int'l Airport, FL
(29) 4/18/00 539,600.00 536,600.00 99 JR Champlain-Rouses Point, NY
(30) 4/19/00 73,201.00 73,201.00 100 JR Miami Int'l Airport, FL
(31) 4/20/00 41,950.00 41,950.00 100 JR Otay Mesa, CA
(32) 4/20/00 22,010.00 22,010.00 100 JR Otay Mesa, CA
(33) 4/20/00 21,159.00 21,159.00 100 JR Otay Mesa, CA
(34) 4/20/00 20,855.00 20,855.00 100 JR Otay Mesa, CA
(35) 5/3/00 52,764.00 52,704.00 99 JC JFK Int'l Airport, NY
(36) 5/8/00 92,986.00 92,986.00 100 JC Newark, NJ
(37) 5/17/00 225,194.00 225,194.00 100 JR Miami Int'l Airport, FL
(38) 5/19/00 62,454.00 62,454.00 100 JR Miami Int'l Airport, FL
(39) 5/26/00 40,552.00 40,300.00 99 JC Newark, NJ
(40) 6/8/00 417,656.00 417,656.00 100 JR Miami Int'l Airport, FL
(41) 6/21/00 431,958.00 431,958.00 100 JR Miami Int'l Airport, FL
(42) 6/23/00 155,290.00 2,155,290.00 100 JR Miami Int'l Airport, FL
(43) 6/25/00 154,560.00 1,034,560.00 89 JC West Palm Beach, FL
(44) 6/27/00 152,409.00 149,810.00 98 JC Newark, NJ
(45) 6/28/00 69,291.00 69,191.00 99 JC Roma, TX
(46) 6/28/00 221,950.00 221,950.00 100 JC Newark, NJ
(47) 6/30/00 252,921.00 252,921.00 100 JR Miami Int'l Airport, FL
(48) 6/30/00 96,556.00 96,556.00 100 JR Miami Int'l Airport, FL
(49) 7/5/00 51,082.00 51,082.00 100 JR Miami Int'l Airport, FL
(50) 7/7/00 126,042.15 126,040.00 99 JC Newark, NJ
(51) 7/8/00 75,959.00 75,959.00 100 JR Miami Int'l Airport, FL
(52) 7/9/00 50,940.00 50,940.00 100 JR Champlain-Rouses Point, NY
(53) 7/11/00 37,479.00 37,479.00 100 JR San Ysidro, CA
(54) 7/19/00 76,165.00 5,000.00 06 JC Chicago, IL
(55) 7/19/00 249,756.00 249,756.00 100 JR Port Everglades, FL
(56) 7/31/00 504,710.67 504,710.67 100 JC Hildago, TX
(57) 7/31/00 345,210.00 345,210.00 100 JR San Ysidro, CA
(58) 8/1/00 231,340.00 231,340.00 100 JR Miami Int'l Airport, FL
(59) 8/12/00 63,413.00 63,413.00 100 JR Miami Int'l Airport, FL
(60) 9/15/00 42,500.00 14,700.00 34 JC JFK Int'l Airport, NY
(61) 9/18/00 86,682.00 42,475.00 49 JC Miami Int'l Airport, FL
(62) 9/20/00 165,074.00 165,074.00 100 JR Newark, NJ
(63) 9/28/00 21,578.00 21,500.00 99 JC JFK Int'l Airport, NY
(64) 9/28/00 72,435.00 72,400.00 99 JC JFK Int'l Airport, NY
(65) 10/1/00 45,021.00 45,021.00 100 JR Miami Int'l Airport, FL
(66) 10/31/00 161,725.78 161,725.78 100 JR Detroit, MI
(67) 11/22/00 32,302.00 32,302.00 100 JC Newark, NJ
(68) 11/22/00 35,877.00 35,877.00 100 JC Newark, NJ
(69) 11/22/00 27,334.00 27,334.00 100 JC Newark, NJ
(70) 11/24/00 14,760.00 14,600.00 98 JC Los Angeles Int'I Apt, CA
(71) 12/7/00 41,251.25 41,251.25 100 JC Blaine, WA
(72) 12/21/00 69,510.00 69,510.00 100 JR Philadelphia Int'l Airport, PA

*649
(73) 1/12/01 209,423.00 209,423.00 100 JR Newark, NJ
(74) 1/15/01 85,880.00 85,880.00 100 JC Blaine, WA
(75) 1/16/01 49,260.00 49,260.00 100 JC Newark, NJ
(76) 1/18/01 20,300.00 20,300.00 100 JC Buffalo-Niagara Falls, NY
(77) 1/19/01 32,559.00 32,559.00 100 JR Miami Int'l Airport, FL
(78) 1/19/01 26,044.00 26,044.00 100 JR Miami Int'l Airport, FL
(79) 2/22/01 23,218.00 23,100.00 99 JC San Juan Int'l Airport, PR
(80) 2/22/01 352,146.00 352,146.00 100 JR Miami Int'l Airport, FL
(81) 3/12/01 91,933.00 68,250.00 74 JC Detroit, MI
(82) 3/26/01 80.090.00 80,090.00 100 JR Miami Int'l Airport, FL
(83) 3/26/01 66,933.00 66,933.00 100 JR Miami Int'l Airport, FL
(84) 3/28/01 35,022.00 34,022.00 97 JR Honolulu Int'l Airport, HI
(85) 4/7/01 72,099.00 72,099.00 100 JR Newark, NJ
(86) 4/18/01 328,495.00 328,495.00 100 JR Fort Lauderdale Int'l Apt, FL
(87) 4/26/01 17,060.00 16,960.00 99 JR San Juan Int'l Airport, PR
(88) 5/1/01 30,358.00 30,358.00 100 JC San Juan Int'l Airport, PR
(89) 5/11/01 24,246.00 24,246.00 100 JC San Juan Int'l Airport, PR
(90) 5/16/01 63,991.00 63,991.00 100 JC San Juan Int'l Airport, PR
(91) 6/7/01 99,884.00 99,884.00 100 JC Newark, NJ
(92) 6/13/01 32,040.00 32,040.00 100 JC Buffalo-Niagara Falls, NY
(93) 6/19/01 112,984.00 112,984.00 100 JR Newark, NJ
(94) 6/20/01 38,120.00 38,000.00 99 JC Buffalo-Niagara Falls, NY
(95) 7/6/01 124,501.00 122,501.00 98 JR Chicago, IL
(96) 8/6/01 89,503.00 89,503.00 100 JR Miami Int'l Airport, FL
(97) 8/7/01 32,378.00 32,378.00 100 JC Detroit, MI
(98) 9/4/01 36,281.69 12,281.69 33 JR Dallas/Ft Worth Airport, TX
(99) 9/21/01 65,200.00 64,800.00 99 JC Nogales, AZ
(100) 9/23/01 20,676.00 20,676.00 100 JC San Juan Int'l Airport, PR
(101) 7/10/01 430,533.66 430,533.66 100 JR Blaine, WA
(102) 10/11/01 27,370.00 27,370.00 100 JC Newark, NJ
(103) 10/30/01 449,270.00 449,270.00 100 JR Champlain-Rouses Point, NY
(104) 11/9/01 119,420.00 113,420.00 94 JR Chicago, IL
(105) 11/13/01 17,155.56 16,155.56 94 JC Detroit, MI
(106) 11/28/01 84,453.00 84,453.00 100 JR Mayaguez, PR
(107) 11/30/01 13,236.00 13,236.00 100 JC Newark, NJ
(108) 12/11/01 35,850.00 30,850.00 86 JC Buffalo-Niagara Falls, NY
(109) 12/13/01 61,483.00 61,483.00 100 JR El Paso, TX*
(110) 12/17/01 17,713.00 17,500.00 98 JR Miami Int'l Airport, FL*
(111) 12/18/01 120,966.00 120,966.00 100 JR Miami Int'l Airport, FL*
(112) 1/13/02 84,870.00 83,867.00 98 JR Newark, NJ
(113) 1/28/02 66,000.00 66,000.00 100 JR Highgate Springs, VT
(114) 1/30/02 119,584.45 119,584.45 100 JC Buffalo-Niagara Falls, NY
(115) 2/1/02 34,284.67 28,506.24 83 JC Buffalo-Niagara Falls, NY
(116) 2/1/02 20,702.78 20,533.76 99 JC Buffalo-Niagara Falls, NY
(117) 2/2/02 230,585.00 220,385.00 95 JC Roma, TX
(118) 2/10/02 323,313.00 323,313.00 100 JC Buffalo-Niagara Falls, NY
(119) 2/13/02 19,041.00 19,041.00 100 JC Buffalo-Niagara Falls, N.Y.*
(120) 2/27/02 110,995.00 110,995.00 100 JR Burlington, VT*
(121) 3/21/02 249,996.00 229,996.00 91 JC Hildago, TX
(122) 4/13/02 51,900.00 51,900.00 100 JC Nogales, AZ
(123) 5/1/02 207,428.69 207,428.69 100 JC Buffalo-Niagara Falls, NY
(124) 6/14/02 110,702.00 110,702.00 100 JR San Diego, CA
(125) 6/27/02 624,691.00 624,691.00 100 JR San Diego, CA*
(126) 7/6/02 15,041.00 15,041.00 100 JC Nogales, AZ
(127) 7/25/02 18,802.00 7,050.75 37 JC Buffalo-Niagara Falls, NY
(128) 7/31/02 61,828.00 61,828.00 100 JR Miami Int'l Airport, FL*
(129) 8/22/02 294,280.00 294,280.00 100 JR Chicago, IL*
(130) 8/24/02 21,833.00 21,833.00 100 JC Presidio, TX
(131) 8/26/02 38,263.00 38,263.00 100 JC Newark, NJ
(132) 9/28/02 14,900.00 14,900.00 100 JC Champlain-Rouses Point, NY
(133) 9/30/02 15,990.00 15,990.00 100 JR Presidio, TX*
(134) 10/5/02 59,640.33 59,640.33 100 JR Lynden, WA
(135) 10/28/02 76,200.00 76,200.00 100 JR Miami Int'l Airport, FL*
(136) 11/7/02 15,187.00 15,187.00 100 JC Nogales, AZ*
(137) 11/15/02 76,723.00 24,000.00 31 JC Seattle-Takoma Airport, WA
(138) 12/14/02 30,510.00 19,373.00 63 JC Douglas, AZ
(139) 12/15/02 43,311.00 43,311.00 100 JC Miami Int'l Airport, FL*
(140) 12/31/02 27,722.00 27,722.00 100 JR San Juan Int'l Airport, PR
(141) 1/27/03 115,000.00 115,000.00 100 JR Salt Lake City, UT*
(142) 3/12/03 105,101.00 105,101.00 100 JC Roma, TX
(143) 3/26/03 190,498.00 190,498.00 100 JC Hildago, TX*
(144) 4/7/03 139,337.00 139,337.00 100 JR Fort Lauderdale Airport, FL*
(145) 4/8/03 20,368.00 20,368.00 100 JC Mobile, AL*

*650
(146) 4/15/03 596,430.00 596,430.00 100 JR Nogales, AZ*
(147) 4/17/03 500,000.00 500,000.00 100 JC Nogales, AZ*
(148) 5/4/03 14,333.00 14,230.00 99 JC Sumas, WA*
(149) 5/14/03 29,284.00 29,284.00 100 JC San Juan Int'l Airport, PR
(150) 5/27/03 18,020.00 9,020.00 50 JC Denver, CO
(151) 6/30/03 39,745.12 39,745.12 100 JC Denver, CO*
(152) 7/1/03 159,000.00 159,000.00 100 JR San Diego, CA*
(153) 7/16/03 40,160.00 40,160.00 100 JR Miami Int'l Airport, FL*
(154) 7/17/03 103,480.00 103,480.00 100 JR Miami Int'l Airport, FL*
(155) 7/25/03 1,176,453.80 300,000.00 25 JR Miami Int'l Airport, FL*
(156) 7/28/03 49,519.67 49,519.67 100 JC Laredo, TX*
(157) 9/14/03 13,151.00 1,972.65 15 JR Champlain-Rouses Point, NY
(158) 10/1/03 950,000.00 950,000.00 100 JR Baltimore, MD*
(159) 10/6/03 25,000.00 25,000.00 100 JC Champlain-Rouses Point, NY
(160) 10/10/03 1,084,183.00 1,084,183.00 100 JC Lake Charles, LA*
(161) 1/28/04 206,017.00 206,017.00 100 JR Washington/Dulles Apt, VA
(162) 2/17/04 81,261.00 81,261.00 100 JC Nogales, AZ*
(163) 2/19/04 47,000.00 47,000.00 100 JC Nogales, AZ*
(164) 2/22/04 464,436.00 464,436.00 100 JC Nogales, AZ*
(165) 2/27/04 19,667.00 19,667.00 100 JC San Juan Int'I Airport, PR
(166) 3/3/04 10,000.00 10,000.00 100 JC Nogales, AZ*
(167) 3/8/04 76,898.00 76,898.00 100 JR Miami Int'l Airport, FL*
(168) 3/25/04 287,310.00 287,310.00 100 JC Nogales, AZ*

V. Application of Law to the Facts: The Amount of Forfeiture

Despite the 100% forfeiture rate commonly used by courts as revealed in the above chart, this percentage appears to be excessive in a case such as the instant one where cash was earned legally and was being taken to the earners' families. Forfeiture of the entire amount that each claimant proves as his own in the instant case would be grossly disproportionate to the gravity of the offenses. Claimants' crime was concealing currency, with intent to evade the currency reporting requirements, and attempting to remove such currency from the United States; it would have been legal to transport the currency had they complied with the reporting requirement. As was pointed out in a pre-Bajakajian case:
Often the carrier is doing a favor for compatriots in this country who are sending hard-earned, legally acquired cash to families in the home country. Forfeiture can have harsh effects under these benign circumstances.
Nonetheless, although currency crimes do not inflame the passions of the public as do drug crimes, they have harmful effects. The currency reporting statutes have a serious purpose. The Currency and Foreign Transactions Reporting Act of 1970 permits the United States to monitor the flow of currency into and out of the country, both for the purpose of determining trade balances and the cash available to this country and to detect and prevent other crimes. Forfeiture is a rational response of the government to violation of currency regulations, and it is one of few effective tools to enforce such laws.
United States v. U.S. Currency in the Amount of One Hundred Forty-Five Thousand, One Hundred Thirty-Nine Dollars ($145,139) and One Hundred Fifty Dollars ($150) in Travelers Checks, More or Less, 803 F.Supp. 592, 599-600 (E.D.N.Y.1992) (citations omitted), aff'd, 18 F.3d 73 (2d Cir.1994). The claimants' violation was unrelated to any other illegal activity and the currency was the proceeds of lawful earnings. Claimants do not fit in the class of persons for whom the statute was principally designed, namely drug traffickers, terrorists, money launderers, racketeers, tax evaders or similar criminals.
The seriousness of claimants' offenses is reflected in claimants' sentence ranges *651 the Sentencing Guidelines: Ali Sher Khan's sentence range, after remand, was 0-6 months; Akbar Khan's was 10-16 months; and Fazal Subhan's was 6-12 months. The fine range for each claimant was $7,500 to $75,000; the fine imposed was $7,500 per claimant.
The harm caused by claimants affected the government by potentially depriving it of the information that these amounts had left the country, and the innocent owners by placing their funds at risk of forfeiture. In addition, the court takes judicial notice of the effort of the government to stop smuggling of cash to cut off sources of terrorist funds. See, e.g., Eric Lichtblau & Timothy L. O'Brien, Efforts to Fight Terror Financing Reported to LAG, N.Y.TIMES, Dec. 12, 2003, at A1; Ronald Smothers, New Citizen is Accused of Plot to Smuggle $650,000 to Egypt, N.Y. TIMES, July 18, 2002, at B5; Don Van Natta, Jr., The Nation; Terrorists Blaze a New Money Trail, N.Y. TIMES, Sept. 28, 2003, § 4, at 1.

VI. Conclusion

An appropriate amount of forfeiture is fifty percent of the amount of currency each claimant proved was his own. Forfeiture shall be $33,500 for Ali Sher Khan, $9,650 for Akbar Ali Khan, and $5,000 for Fazal Subhan. Although the amount of forfeiture for Ali Sher Khan and Akbar Ali Khan exceeds the criminal fine that was imposed, it does not exceed the maximum criminal fine that could have been imposed. Any balance remaining shall be returned to the appropriate claimant.
SO ORDERED.